MAURA HEALEY
Attorney General of Massachusetts
YAEL SHAVIT (Pro Hac Forthcoming)
MIRANDA COVER (Pro Hac Forthcoming)
MAX WEINSTEIN (Pro Hac Forthcoming)
Assistant Attorneys General
 One Ashburton Place
 Boston, MA 02108
 Tel: (617) 963-2197
 Fax: (617) 727-5762
 Email: yael.shavit@state.ma.us

*Attorneys for Plaintiff the Commonwealth of
Massachusetts*

XAVIER BECERRA
Attorney General of California
NICKLAS A. AKERS
Senior Assistant Attorney General
BERNARD A. ESKANDARI (SBN 244395)
Supervising Deputy Attorney General
 300 South Spring Street, Suite 1702
 Los Angeles, CA 90013
 Tel: (23713) 269-6348
 Fax: (213) 897-4951
 Email: bernard.eskandari@doj.ca.gov

*Attorneys for Plaintiff the People of the State
of California*

[See signature page for the complete list
of parties represented. Civ. L.R. 3-4(a)(1).]

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **COMMONWEALTH OF MASSACHUSETTS; PEOPLE OF THE STATE OF CALIFORNIA** ex rel. Xavier Becerra, Attorney General of California; **STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF HAWAI'I; PEOPLE OF THE STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND;** ATTORNEY GENERAL DANA NESSEL on behalf of the **PEOPLE OF MICHIGAN; STATE OF MINNESOTA** by and through Attorney General Keith Ellison; **STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF NORTH CAROLINA** ex rel. Attorney General Joshua H. Stein; **STATE OF OREGON; COMMONWEALTH OF PENNSYLVANIA; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA** ex rel. Attorney General Mark R. Herring; **STATE OF WISCONSIN,** <br><br> Plaintiffs, <br><br> v. <br><br> **BETSY DEVOS**, in her official capacity as Secretary of Education; and **UNITED STATES DEPARTMENT OF EDUCATION,** <br><br> Defendants. | Case No. 20-cv-04717 <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** <br><br> **ADMINISTRATIVE PROCEDURE ACT CASE** |

**INTRODUCTION**

1.      In response to numerous federal investigations and reports documenting the abusive and fraudulent conduct of for-profit schools, Congress in 1993 directed the Secretary of Education to "specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a [federal student] loan." 20 U.S.C. § 1087e(h).

2.      In so doing, Congress applied a broadly applicable and well-established principle of consumer protection law. When a business treats a consumer in an unfair or deceptive manner, or otherwise violates applicable law, a consumer may assert that conduct as a defense to repaying a loan that financed the purchase of the goods or services that business provided.

3.      For more than two decades, the U.S. Department of Education's ("ED") regulations permitted a borrower to "assert as a defense against repayment, any act or omission of the school . . . that would give rise to a cause of action against the school under applicable State law." 34 C.F.R. § 685.206 (1996).

4.      In 2016, ED promulgated more extensive regulations (the "2016 Rule"), providing clear standards for borrowers seeking borrower defense relief and establishing important deterrents to institutional misconduct. Under these regulations, enforcement actions brought by state attorneys general and judgments obtained by borrowers against schools for violations of state consumer protection law served as bases for borrower defense claims.

5.      In 2019, ED issued new regulations (the "2019 Rule") governing the defenses borrowers may assert to the repayment of their federal student loans. The 2019 Rule for the first time completely eliminated violations of applicable state consumer protection law as a viable defense to repayment of federal student loans.

6.      In fact, ED eliminated all available defenses, except just one: "a misrepresentation . . . of material fact upon which the borrower reasonably relied in deciding to obtain" a federal student loan. 84 Fed. Reg. 49,803.

7.      Even after drastically limiting available defenses, ED imposed additional requirements on a viable misrepresentation defense that are so onerous that they make this

1

defense impossible for a student loan borrower to assert successfully.

8.     Amongst other arbitrary impediments, the 2019 Rule requires borrowers to prove by a preponderance of the evidence not merely that their school misrepresented a material fact, but that the school did so knowingly or with reckless disregard for the truth. A school may misrepresent the job or earnings prospects of its graduates, the likelihood of completing its program, even the vocational licensing requirements of state law—but a borrower cannot assert these misrepresentations as a defense unless he or she can prove that the school did not simply make a mistake.

9.     Moreover, the 2019 Rule requires each and every borrower to meet this insurmountable burden on their own. Notwithstanding the fact that borrower defense claims frequently involve common issues of fact, the 2019 Rule arbitrarily eliminates any group discharge process.

10.     In reality, the 2019 Rule eliminates all viable defenses to repayment, contrary to Congress's mandate to ED. ED does not even fully deny this fact, and states that one of the primary purposes of the 2019 Rule is to diminish successful borrower defense claims even where, as ED concedes, the school has engaged in actionable misconduct.

11.     The 2019 Rule brims with ill-disguised contempt for struggling students, castigating them as irresponsible, prone to making frivolous claims on pretextual grounds, when the supposedly true source of their financial difficulties are their own poor career decisions. ED also selectively expresses concern for the federal taxpayer, at times touting "savings" at the expense of victimized borrowers, while at others acknowledging that the 2019 Rule will result in greater costs for taxpayers with financially irresponsible schools continuing to receive hundreds of millions of federal dollars.

12.     The true intended beneficiary of the 2019 Rule is the for-profit school industry. The 2019 Rule expresses special solicitude for these private businesses, seeking to protect their reputations, and to spare them accountability for their violations of state and federal law.

13.     In its effort to protect the for-profit school industry, ED relies on unsupported assumptions, fails to explain ED's fundamental changes of position, and ignores considerable

2

1  evidence in the record before ED. These infirmities render the 2019 Rule arbitrary, capricious, an

2  abuse of discretion, or otherwise not in accordance with law in violation of the Administrative

3  Procedure Act ("APA"), 5 U.S.C. § 706(2)(A).

4        14.    Furthermore, by promulgating regulations that do nothing more than prevent

5  borrowers from obtaining relief, ED has failed to meet its congressional mandate to specify actual

6  borrower defenses. As such, the 2019 Rule is not in accordance with law and is in excess of

7  statutory jurisdiction, authority, or limitations, or short of statutory right, also in violation of the

8  APA, 5 U.S.C. § 706(2)(A), (C). Accordingly, the Court should vacate the 2019 Rule in its

9  entirety.

10  **JURISDICTION AND VENUE**

11        15.    This action arises under the APA, 5 U.S.C. §§ 553, 701-706. This Court has

12  subject matter jurisdiction over this action because it is a case arising under federal law, 28

13  U.S.C. § 1331. In addition, this Court may issue the declaratory relief sought. 28 U.S.C. §§ 2201-

14  2202.

15        16.    Venue is proper in this judicial district under 28 U.S.C. § 1391(e)(1) because the

16  People of the State of California reside in this district and no real property is involved in this

17  action.

18  **INTRADISTRICT ASSIGNMENT**

19        17.    Assignment to the San Francisco Division is appropriate because a substantial part

20  of the events or omissions giving rise to the claims in this complaint occurred in the County of

21  San Francisco. *See* Civ. L.R. 3-2(c). Among other events, a number of predatory colleges that are

22  impacted by the rescission and replacement of the 2016 Rule have campuses that are located in

23  the County of San Francisco. Moreover, the People of the State of California maintain an office in

24  the San Francisco Division.

25  **PARTIES**

26        18.    Plaintiff the Commonwealth of Massachusetts brings this action by and through

27  Attorney General Maura Healey.

28        19.    Plaintiff the People of the State of California brings this action by and through

Attorney General Xavier Becerra.

20.     Plaintiff the State of Colorado is a sovereign state of the United States of America. Colorado brings this action by and through Attorney General Philip J. Weiser, who is the chief legal counsel of the State of Colorado, empowered to prosecute and defend all actions in which the state is a party. Colo. Rev. Stat. § 24-31-101(1)(a).

21.     Plaintiff the State of Connecticut is a sovereign state of the United States of America. This action is brought on behalf of the State of Connecticut by and through Attorney General William Tong, chief legal officer of the State with general supervision over all legal matters in which the State is an interested party. Conn. Gen. Stat. § 3-125.

22.     Plaintiff the State of Delaware is a sovereign state of the United States of America. This action is brought on behalf of the State of Delaware by Attorney General Kathleen Jennings, the "chief law officer of the State." *Darling Apartment Co. v. Springer*, 22 A.2d 397, 403 (Del. 1941). Attorney General Jennings also brings this action on behalf of the State of Delaware pursuant to her statutory authority. Del. Code Ann. tit. 29, § 2504.

23.     Plaintiff the District of Columbia is a sovereign municipal corporation organized under the Constitution of the United States. It is empowered to sue and be sued, and it is the local government for the territory constituting the permanent seat of the federal government. The District is represented by and through its chief legal officer, the Attorney General for the District of Columbia, Karl A. Racine. The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District and is responsible for upholding the public interest. D.C. Code. § 1-301.81

24.     Plaintiff the State of Hawai'i brings this action by and through Attorney General Clare E. Connors.

25.     Plaintiff, the State of Illinois, is represented by its Attorney General, Kwame Raoul, as its chief law enforcement officer. Ill. Constit. Art. V, § 15. Attorney General Raoul has broad statutory and common law authority to act in the interests of the State of Illinois and its citizens in matters of public concern, health, and welfare. 15 ILCS 205/4.

26.     Plaintiff the People of the State of Maine brings this action by and through

1    Attorney General Aaron M. Frey.

2         27.    Plaintiff the State of Maryland is a sovereign state of the United States of America.

3    Maryland is represented by and through its chief legal officer, Attorney General Brian E. Frosh.

4    The Attorney General has general charge, supervision, and direction of the State's legal business,

5    and acts as legal advisor and representative of all major agencies, boards, commissions, and

6    official institutions of state government. The Attorney General's powers and duties include acting

7    on behalf of the State and the people of Maryland in the federal courts on matters of public

8    concern. Md. Const. art. V § 3(a); Joint Res. 1 (2017).

9         28.    Plaintiff the People of the State of Michigan brings this action by and through

10   Attorney General Dana Nessel.

11        29.    Plaintiff the State of Minnesota brings this action by and through its Attorney

12   General Keith Ellison.

13        30.    Plaintiff the State of Nevada brings this action by and through its Attorney

14   General, Aaron D. Ford and Consumer Advocate, Ernest D. Figueroa.

15        31.    Plaintiff the State of New Jersey is a sovereign state of the United States of

16   America. This action is being brought on behalf of the State by Attorney General Gurbir S.

17   Grewal, the State's chief legal officer. N.J. Stat. Ann § 52:17A-4(e), (g).

18        32.    Plaintiff the State of New Mexico is a body politic created by the Constitution and

19   laws of the State; as such, it is not a citizen of any state. This action is brought for and on behalf

20   of the State of New Mexico in its sovereign authority, by and through its duly elected Attorney

21   General, Hector Balderas. The Attorney General, as chief legal officer of the State, is statutorily

22   authorized to initiate and prosecute any and all suits deemed necessary for the protection of the

23   interests and rights of the State. Attorney General Balderas is acting pursuant to his authority

24   under NMSA 1978, Sections 8-5-1 *et seq.*

25        33.    Plaintiff the State of New York is a sovereign state of the United States of

26   America. This action is being brought on behalf of the State by Attorney General Letitia James.

27   *See* New York Executive Law § 63(1).

28        34.    Plaintiff the State of North Carolina is a sovereign state of the United States of

America. This action is brought on behalf of the State of North Carolina by Attorney General Joshua H. Stein, who is the chief legal counsel of the State of North Carolina and who has both statutory and constitutional authority and responsibility to represent the State, its agencies, its officials, and the public interest in litigation. N.C. Gen. Stat. § 114-2.

35.   Plaintiff the State of Oregon brings this action by and through Attorney General Ellen F. Rosenblum.

36.   Plaintiff the Commonwealth of Pennsylvania is a sovereign state of the United States of America. This action is brought on behalf of the Commonwealth by Attorney General Josh Shapiro, the "chief law officer of the Commonwealth." Pa. Const. art. IV, § 4.1. Attorney General Shapiro brings this action on behalf of the Commonwealth pursuant to his statutory authority under 71 Pa. Stat. § 732-204.

37.   Plaintiff the State of Rhode Island brings this action by and through Attorney General Peter F. Neronha.

38.   Plaintiff the State of Vermont bring this action by and through Attorney General Thomas J. Donovan, Jr.

39.   Plaintiff the Commonwealth of Virginia is a sovereign state of the United States of America. Virginia brings this action by, through, and at the relation of Attorney General Mark R. Herring. As chief executive officer of the Department of Law, Attorney General Herring performs all legal services in civil matters for the Commonwealth. Va. Const. art V, § 15; Va. Code Ann. §§ 2.2-500, 2.2-507.

40.   Plaintiff the State of Wisconsin is a sovereign state of the United States of America. Attorney General Joshua L. Kaul brings this action pursuant to his authority under Wis. Stat. § 165.25(1m).

41.   The Plaintiffs are collectively referred to as "the States."

42.   Defendant Betsy DeVos is the Secretary of the United States Department of Education and is being sued in her official capacity. Her official address is 400 Maryland Avenue, SW, Washington, D.C. 20202.

43.   Defendant United States Department of Education is an executive agency of the

1  United States government, with its principal address at 400 Maryland Avenue, SW, Washington,

2  D.C. 20202.

3  **FACTUAL ALLEGATIONS**

4  **I.   FEDERAL STUDENT LOANS, FOR-PROFIT SCHOOLS, AND BORROWER DEFENSES**

5          44.     Title IV of the Higher Education Act of 1965, as amended ("HEA"), 20 U.S.C.

6  § 1070 *et seq.*, authorizes federal assistance programs that provide financial aid to students ("Title

7  IV aid") to attend certain postsecondary institutions of higher education (a "school" or an

8  "institution").

9          45.     Each year, ED provides billions of dollars in Title IV aid in the form of federal

10  student loans, work-study, and grants. In fiscal year 2019, for example, ED provided more than

11  $120 billion to, or on behalf of, students. Federal Student Aid, *FY 2019 Annual Report*, Nov. 15,

12  2019, https://studentaid.ed.gov/sa/sites/default/files/FY_2019_Federal_Student_Aid_Annual_

13  Report_Final.pdf.

14          46.     Title IV aid provides critical assistance to students and fosters access to higher

15  education. ED administers multiple student loan programs under Title IV, including the Federal

16  Family Education Loan Program ("FFEL Program") and the William D. Ford Direct Student

17  Loan Program ("Direct Loan Program"). These loan programs are important for students who

18  otherwise would not be able to afford the cost of higher education and could not meet the

19  underwriting standards of private lenders.

20          47.     Just as students rely on federal student loans in order to pay for higher education,

21  student loans and other forms of Title IV aid are an indispensable source of revenue for colleges

22  and institutions.

23          48.     Federal student loans are especially central to the business models of for-profit

24  schools.

25          49.     For-profit or "proprietary" schools are private businesses that attempt to generate

26  profits for their owners and shareholders by offering predominantly vocational programs and

27  training.

28          50.     The vast majority of for-profit schools' revenue comes from Title IV funds. *For*

7

*Profit Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student Success*, at 2-3 (July 30, 2012), https://www.help.senate.gov/imo/media/for_profit_report/PartI-PartIII-SelectedAppendixes.pdf ("Senate Report"). For example, the Senate Report estimates that in 2009, publicly traded for-profit education companies received 86% of their revenues from Title IV funds. *Id.* at 3.

51.     Despite the fact that for-profit schools are largely dependent on taxpayer-funded Title IV aid, these schools are excessively expensive for the students who attend them. Certificate programs at for-profit schools typically cost 4.5 times more than comparable programs at a community college. *Id.* at 36. The tuition charged by for-profit schools is often a product of the school's profit goals, rather than anticipated academic and instructional expenses. *Id.* at 3.

52.     At the same time, for-profit schools also spend relatively little on education; the Senate Report found that only 17.2% of for-profit schools' revenue was spent on instruction, less than the amount allocated for marketing, advertising, recruiting, and admissions staffing, and less than the amount generated as profit. *Id.* at 6.

53.     For-profit schools typically advertise to students with modest financial resources. Many of these students are the first in their families to seek higher education. For-profit schools in many instances direct their marketing toward low-income and minority students, particularly low-income women of color and veterans. Additionally, for-profit schools target individuals who are unemployed and thus eligible for federal workforce retraining monies, as well as veterans who are eligible for federal veterans' benefits.

54.     Federal authorities have long recognized that the for-profit school industry is prone to abusing its access to taxpayer-funded Title IV aid at the expense of low-income, unsophisticated students.

55.     For example, in 1988, William J. Bennett, Secretary of Education in the administration of President George H. W. Bush, called on Congress "to curb the 'shameful and tragic' abuse of student financial-aid programs by proprietary schools," noting that the abuse "is an outrage perpetrated not only on the American taxpayer but, most tragically, upon some of the most disadvantaged, and most vulnerable members of society . . . ." Robert Rothman, "Bennett

Asks Congress to Put Curb on 'Exploitative' For-Profit Schools," Education Week, February 17, 1988, https://www.edweek.org/ew/articles/1988/02/17/07450039.h07.html. Secretary Bennett denounced the "exploitative and deceitful practices" of for-profit schools, citing "falsified scores on entrance exams, poor-quality training, and harsh refund policies," amongst other abuses. *Id.*

56.     In 1990, the U.S. Senate Permanent Subcommittee on Investigations found that the federal student loan program, "particularly as it relates to proprietary schools, is riddled with fraud, waste, and abuse, and is plagued by substantial mismanagement and incompetence" and that the program failed "to insure that federal dollars are providing quality, not merely quantity, in education." Abuses in Federal Aid Programs, Permanent Subcommittee on Investigations of the Committee on Governmental Affairs, 102nd Cong., 1st Sess., Report 102-58, at 6, 33, https://files.eric.ed.gov/fulltext/ED332631.pdf. The report further found that:

> [M]any of the program's intended beneficiaries—hundreds of thousands of young people, many of whom come from backgrounds with already limited opportunities— have suffered further. . . . Victimized by unscrupulous profiteers and their fraudulent schools, students have received neither the training nor the skills they hoped to acquire and, instead, have been left burdened with debts they cannot repay.

*Id.* at 33.

57.     In 1993, in response to years of documented institutional misconduct, particularly by for-profit schools, Congress amended the HEA to address the circumstances under which a student borrower may assert a defense to the obligation to repay a federal student loan. As amended, the HEA mandates that "the Secretary shall specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a loan made under [the Direct Loan Program.]" 20 U.S.C. § 1087e(h).

58.     In enacting this amendment, Congress recognized that a student should be able to assert the misconduct of their school as a defense to repaying a loan that financed the cost of attending that school, just as a purchaser of an automobile can assert the misconduct of the automobile dealer as a defense to repaying the loan that financed the purchase. *See, e.g.*, "Trade Regulation Rule concerning Preservation of Consumers' Claims and Defenses," 40 Fed. Reg. 53,506 (final version of and rationale for FTC's "holder rule," published in 1975).

59.     In 1995, in accordance with the HEA's mandate, ED promulgated the first

borrower defense regulations. *See* ED, Proposed Rule, 81 Fed. Reg. 39,330, 39,333 (June 16, 2016) ("2016 NPRM"). These regulations permitted a borrower to "assert as a defense against repayment [of his or her Direct Loans], any act or omission of the school . . . that would give rise to a cause of action against the school under applicable State law." 34 C.F.R. § 685.206 (1996).

60.     Relatedly, the HEA also requires the Secretary to discharge a borrower's liability on loans when the borrower is "unable to complete the program in which such student is enrolled due to the closure of the institution," 20 U.S.C. § 1087(c)(1), or "if such student's eligibility to borrow under this part was falsely certified by the eligible institution or was falsely certified as a result of a crime of identity theft," *id*. Discharges in the first situation are often referred to as "closed school discharges," and discharges in the second situation are often referred to as "false certification discharges."

## II.   FOR-PROFIT SCHOOL MISCONDUCT AND STATE ENFORCEMENT ACTIONS

61.     The offices of State Attorneys General have taken the leading role amongst law enforcement agencies in addressing the abuses of the for-profit school industry.

62.     In response to widespread institutional misconduct, the States, by and through their Attorneys General, have initiated numerous investigations and enforcement actions against proprietary and for-profit schools for violations of the States' consumer protection statutes.[1]

63.     Through these investigations and enforcement actions, the States have uncovered a wide array of predatory practices employed by abusive for-profit schools. These practices commonly include unfair and harassing recruitment tactics; false and misleading representations to consumers and prospective students designed to induce enrollment in the schools; the recruitment and enrollment of students unable to benefit from the education sought; and the creation, guarantee, and funding of predatory private student loans.

64.     For example, numerous investigations have revealed that for-profit schools misrepresent critical information to prospective students, including their likelihood of finding employment in their field of study, their likelihood of completing their program of study, and

---

[1] A list of such state investigations and enforcement actions is attached as Appendix A to this Complaint.

10

their likelihood of repaying the student loan debt they must incur to finance their educations.[2]

65.     Similarly, for-profit schools regularly deploy high-pressure sales tactics with prospective students, including creating a false sense of urgency and pressuring them to enroll immediately to ensure their place in a class even where the school has open or rolling enrollment[3] and lying to them about their ability to transfer credits to other institutions.[4]

66.     State investigations and enforcement actions have revealed that for-profit schools enroll students in professional certification programs that lack the programmatic accreditation necessary for students to obtain licensure in their profession and fail to disclose such lack of accreditation to students.[5] Schools have enrolled students who lack the necessary credentials or qualifications to obtain employment in the professions for which they are training.[6]

67.     State investigations and enforcement actions have further demonstrated that for-profit schools have failed to provide students with qualified instructors, in some instances hiring

---

[2] *See, e.g.*, *People of the State of California v. Corinthian Colleges, Inc., et al.*, No. CGC-13-534793 (Cal. Super. Ct, Mar. 23, 2016); *People of the State of Illinois v. Westwood College, Inc., et al.*, Second Amended Complaint, Doc. No. 57, No. 14-cv-03786 (N.D. Ill. Sept. 30, 2014), at ¶ 3-5, 67-78; Complaint, *Massachusetts v. Premier Educ. Grp.*, No. 14-3854 (Mass. Super. Ct. Dec. 9, 2014), p. 4, http://www.mass.gov/ago/docs/press/2014/salter-complaint.pdf.

[3] *See, e.g.*, Final Judgment by Consent, *Massachusetts v. The Career Institute, LLC. et al.*, No. 13-4128H (Mass. Super. Ct. June 1, 2016); *People of the State of Illinois v. Westwood College, Inc., et al.*, Second Amended Complaint, Doc. No. 57, No. 14-cv-03786 (N.D. Ill. Sept. 30, 2014), at ¶ 477, 492; Assurance of Discontinuance, *In the Matter of Kaplan, Inc., Kaplan Higher Education, LLC*, No. 15-2218B (Mass. Super. Ct. July 23, 2015), ¶ 3, http://www.mass.gov/ago/docs/press/2015/kaplan-settlement.pdf.

[4] *See, e.g.*, *People of the State of California v. Corinthian Colleges, Inc., et al.*, No. CGC-13-534793 (Cal. Super. Ct. Mar. 23, 2016); Complaint, *Minnesota v. Minnesota School of Business, Inc., et al.*, No. 27-CV-14-12558 (Minn. Dist. Ct. July 22, 2014).

[5] *See, e.g.*, Complaint, *State of New York v. Education Management Corp., et al.*, No. 453046/15 (N.Y. Sup. Ct. Nov. 16, 2015); Assurance of Discontinuance, *In re Herzing, Inc.*, No. 62-cv-13-8231 (Minn. 2d Dist. Ct. Nov. 27, 2013); *People of the State of Illinois v. Westwood College, Inc., et al.*, Second Amended Complaint, Doc. No. 57, No. 14-cv-03786 (N.D. Ill. Sept. 30, 2014), at ¶ 137-189.

[6] *See, e.g.*, Complaint, *Massachusetts v. The Career Institute, LLC., et al.*, No. 13-4128H (Mass. Super. Ct. Sept. 17, 2015), at ¶ 2, 117-126, http://www.mass.gov/ago/docs/consumer/aci-amended-complaint.pdf; Final Judgment by Consent, *Massachusetts v. The Career Institute, LLC. et al.*, No. 13-4128H (Mass. Super. Ct. June 1, 2016); Findings of Fact, Conclusions of Law, & Order, *State of Minnesota v. Minn. Sch. of Bus., Inc.*, No. 27-CV-14-12558, 2016 WL 9709976 (Minn. 4th Dist. Ct. Sep. 08, 2016); Complaint, *People of the State of Illinois v. Westwood College, Inc., et al.*, No. 12 CH 01587 (Cir. Ct. Cook County Jan. 18, 2012).

1   instructors for professional programs who have never worked in the relevant professions and who

2   have no prior teaching experience.[7]

3          68.   Additionally, state investigations and enforcement actions have demonstrated that

4   for-profit schools have failed to provide students in vocational programs with any career

5   counseling or assistance obtaining mandatory externships and post-graduate employment.[8]

6          69.   In some cases, for-profit schools have affixed student signatures to various

7   records, including enrollment agreements, without students' knowledge or permission.[9]

8          70.   In addition to pursuing these investigations and enforcement actions against for-

9   profit schools, State Attorneys General have expended state funds and resources to assist students

10  affected by institutional misconduct in obtaining federal student loan forgiveness.

11  **III.   THE 2016 BORROWER DEFENSE RULE**

12         71.   In 2014, Corinthian Colleges ("Corinthian"), a large nationwide chain of for-profit

13  schools that had been the target of numerous investigations and enforcement actions by State

14  Attorneys General, abruptly closed.

15         72.   Largely in response to Corinthian's closure, in 2015, ED undertook a new

16  negotiated rulemaking process to update its borrower defense regulations.

17         73.   State Attorneys General participated in this negotiated rulemaking, serving on the

18  negotiating committee, providing input on draft provisions through the State Attorney General

19

20         [7] *See, e.g.*, Complaint, *Massachusetts v. Corinthian Colleges, Inc., et al.* No. 14-1093
    (Mass. Super. Ct. Apr. 3, 2014); Complaint, *Massachusetts v. The Career Institute, LLC., et al.*,
21  No. 13-4128H (Mass. Super. Ct. Sept. 17, 2015), ¶ 141-147,
    http://www.mass.gov/ago/docs/consumer/aci-amended-complaint.pdf; Complaint, *Massachusetts
22  v. ITT Educ. Servs. Inc.*, No. 16-0411 (Mass. Super. Ct. Mar. 31, 2016), ¶ 94.

23         [8] *See, e.g.*, Complaint, *Massachusetts v. Corinthian Colleges, Inc., et al.* No. 14-1093
    (Mass. Super. Ct. Apr. 3, 2014); Complaint, *Massachusetts v. Premier Educ. Grp.*, No. 14-3854
24  (Mass. Super. Ct. Dec. 9, 2014), p. 4-5, http://www.mass.gov/ago/docs/press/2014/salter-
    complaint.pdf; Assurance of Discontinuance, *In the Matter of Kaplan, Inc., Kaplan Higher
25  Education, LLC*, No. 15-2218B (Mass. Super. Ct. July 23, 2015), ¶ 3,
    http://www.mass.gov/ago/docs/press/2015/kaplan-settlement.pdf; Complaint, *Minnesota v.
26  Minnesota School of Business, Inc., et al.*, No. 27-CV-14-12558 (Minn. Dist. Ct. July 22, 2014).

27         [9] *See, e.g.*, Final Judgment by Consent, *Massachusetts v. The Career Institute, LLC. et al.*,
    No. 13-4128H (Mass. Super. Ct. June 1, 2016); Complaint, *Massachusetts v. The Career
28  Institute, LLC., et al.*, No. 13-4128H (Mass. Super. Ct. Sept. 17, 2015), ¶ 2, 72,
    http://www.mass.gov/ago/docs/consumer/aci-amended-complaint.pdf.

representatives on the negotiating committee, and submitting comments to ED throughout the process. *See* 81 Fed. Reg. 39,333 (announcing California Deputy Attorney General Bernard Eskandari as a member of the negotiating committee and Massachusetts Assistant Attorney General Mike Firestone as an alternate member of the negotiating committee).

74.    ED promulgated the 2016 Rule on November 1, 2016, 81 Fed. Reg. 75,926 (Nov. 1, 2016), and added supplemental "Borrower Defense Procedures" to the 2016 Rule on January 19, 2017, 82 Fed. Reg. 6253 (Jan. 19, 2017).

75.    The 2016 Rule was designed to "protect student loan borrowers from misleading, deceitful, and predatory practices of, and failures to fulfill contractual promises by, institutions participating in ED's student aid programs," 81 Fed. Reg. 75,926, by, inter alia:

- creating standards for loan discharge and clarifying the process by which students can seek to have their federal loans discharged on the basis of their schools' misconduct;

- providing "students [with] access to consistent, clear, fair, and transparent processes to seek debt relief . . . ," 81 Fed. Reg. 75,926;

- "[e]mpowering the Secretary to provide debt relief to borrowers without requiring individual applications in instances of widespread misrepresentations," Press Release, Department of Education, *U.S. Department of Education Announces Final Regulations to Protect Students and Taxpayers from Predatory Institutions* (Oct. 28, 2016), https://www.ed.gov/news/press-releases/us-department-education-announces-final-regulations-protect-students-and-taxpayers-predatory-institutions;

- "protect[ing] taxpayers by requiring that financially risky institutions are prepared to take responsibility for losses to the government when their illegal conduct results in discharges of borrowers' loans", 81 Fed. Reg. 75,926;

- deterring school misconduct by "targeting specific institutional activities" and removing "the worst performers . . . from the system," 81 Fed. Reg. 76,056;

- requiring institutions with poor loan repayment outcomes to provide "plain language warnings" about their loan repayment rates in advertising and promotional materials in order to help students make more informed decisions concerning their educational choices, 81 Fed. Reg. 75,927; and

- placing limitations on the use of mandatory predispute arbitration agreements or class action waivers in student enrollment agreements by schools participating in the Direct Loan Program. 81 Fed. Reg. 75,926-27.

13

76.     In particular, the 2016 Rule explicitly permitted borrowers to affirmatively assert a borrower defense claim and established a uniform standard for such claims. *Id.* at 75,961-64 (discussing 34 C.F.R. § 685.222). The 2016 Rule established that a borrower defense could be raised where the borrower was party to a judgment against a school based on violations of state or federal law, a school had breached its contract with the borrower, and where a school had "made a substantial misrepresentation . . . that the borrower reasonably relied on to the borrower's detriment when the borrower decided to attend, or to continue attending, the school or decided to take out a direct loan." 81 Fed. Reg. 76,083; 34 C.F.R. § 685.222(b)–(d)); *see also* 34 C.F.R. § 668.71(c) (defining "misrepresentation").

77.     The 2016 Rule also afforded a legally significant status to enforcement actions and investigations undertaken by State Attorneys General. A successful enforcement action brought against a postsecondary institution by a State Attorney General could also be asserted by individual borrowers as a defense to loan repayment. *See* 81 Fed. Reg. 76,083; 34 C.F.R. § 685.222(b).

78.     The 2016 Rule adopted a "preponderance of the evidence" standard for borrower defense claims and required ED to consider all information in its possession, regardless of whether that information was provided or possessed by the borrower. 81 Fed. Reg. 76,083-84; 34 C.F.R. § 685.222(a)(2), (e)(3). The 2016 Rule provided that a borrower could assert a defense to repayment of unpaid amounts at any time and not subject to any statute of limitations. 81 Fed. Reg. 76,083; 34 C.F.R. § 685.222(d).

79.     The 2016 Rule also explicitly authorized ED to grant borrower defense relief to cohorts of borrowers without requiring individual applications on the basis of factors "including, but not limited to, common facts and claims, fiscal impact, and the promotion of compliance by the school or other title IV, HEA program participant." 81 Fed. Reg. 76,084; 34 C.F.R. § 685.222(f). In proposing this group process, ED explained that it both served the goals of ensuring that the borrower defense process is "simple, accessible, and fair" and would "promote greater efficiency and expediency in the resolution of borrower defense claims." 81 Fed. Reg. 39,347.

14

80.     The 2016 Rule made closed school loan discharges automatic under certain circumstances. Under the 2016 Rule, students who did not re-enroll in a Title IV institution within three years following their school's closure were granted an automatic discharge. 81 Fed. Reg. 76,081; 34 C.F.R. § 685.214(c)(2).

81.     The 2016 Rule also included a number of provisions designed to discourage institutional abuses, promote institutional accountability for misconduct, and ensure that abusive institutions—rather than borrowers or taxpayers—bore the cost of institutional misconduct. In particular, the 2016 Rule set forth the process by which ED could recoup the costs associated with providing relief on successful borrower defense claims from the institutions themselves.

82.     Under the 2016 Rule, institutional participation in Title IV programs was conditioned on the schools agreeing not to rely on (i) mandatory predispute arbitration agreements to bar students from litigation claims related to institutional conduct that would constitute a borrower defense to repayment, or (ii) predispute class action waivers as to such conduct. ED justified these provisions on the ground that they deterred institutional misconduct, ensured that schools bear the costs of their own misconduct, and promoted the public disclosure of school misconduct. 81 Fed. Reg. 76,026.

83.     The 2016 Rule also identified a list of "triggering" events that serve as indicators of an institution's financial instability. Where such triggering events occurred, the 2016 Rule required the school to provide ED with a letter of credit. These triggering events included certain enforcement actions by State Attorneys General. *See* 81 Fed. Reg. 76,080, 76,084-85; 34 C.F.R. §§ 685.206(c)(4)(iii), 685.222(e)(7)(iii)(C), and 685.222(h)(5)(iii)(C).

84.     In order to "help students, prospective students, and their families make informed decisions based on information about an institution's financial soundness and its borrowers' loan repayment outcomes," ED also included disclosure requirements in the 2016 Rule requiring for-profit schools to disclose to students and prospective students when it experienced a "triggering" event and to disclose in promotional materials certain loan repayment metrics. 81 Fed. Reg. 75,927; 34 C.F.R. § 668.41(h), (i).

15

**IV.    ED'S INITIATION OF A NEW BORROWER DEFENSE RULEMAKING**

85.    On June 16, 2017, merely two weeks before the 2016 Rule was due to take effect, ED announced the initiation of a negotiated rulemaking process intended to rescind and replace the 2016 Rule. Notice of Intent to Establish Negotiated Rulemaking Committees; Negotiated Rulemaking Committee; Public Hearings, 82 Fed. Reg. 27,640 (June 16, 2017).

86.    On the same day, ED issued a notice purporting to delay implementation of numerous provisions included in the 2016 Rule. 82 Fed. Reg. 27,621 (June 16, 2017). ED subsequently issued two additional delay rules, which together purported to delay implementation of the 2016 Rule until July 1, 2019. 82 Fed. Reg. 49,114, 49,114 (Oct. 24, 2017); 83 Fed. Reg. 6458 (Feb. 14, 2018). A group of 20 states filed a lawsuit challenging the lawfulness of these delay rules, as did a group of student loan borrowers. The Court consolidated these cases under the caption *Bauer v. DeVos* and held that the delay rules were unlawful. 325 F. Supp. 3d 74, 110 (D.D.C. 2018). The Court ordered ED to implement the 2016 Rule in its entirety on October 12, 2018. *Bauer v. DeVos*, 332 F. Supp. 3d 181, 186 (D.D.C. 2018).

87.    On July 31, 2018, ED issued a notice of proposed rulemaking ("2018 NPRM"). 83 Fed. Reg. 37,257 (July 31, 2019). The NPRM was premised on factual inaccuracies and unsubstantiated assumptions. Notably, despite proposing to "rescind" the 2016 Rule, the NPRM inaccurately referred to the "current regulations" as the previous regulations that were promulgated in 1995 and treated the 1995 regulations as the operative regulations. 83 Fed. Reg. 37,250-51.

88.    On January 18, 2019, following the Court's decision in *Bauer*, ED announced at a negotiated rulemaking session that it intended to replace and reissue the 2018 NPRM in light of the *Bauer* decision's mandated implementation of the 2016 Rule. *See* https://predatorystudentlending.org/news/press-releases/department-education-plan-redo-rule-protects-students-harmed-illegal-school-conduct-falls-short-press-release.

89.    ED never reissued the 2018 NPRM. Instead, in the text of the final published regulations, ED addressed its change of course, conceding that it had "initially considered publishing a second NPRM that used [the 2016] regulations as a starting point," but that it

16

ultimately decided not to publish a new NPRM to prevent "further delay [of] the finality of the rulemaking process." 84 Fed. Reg. 49,789.

## V.    THE 2019 BORROWER DEFENSE RULE

90.    ED published its new borrower defense regulations on September 23, 2019. 84 Fed. Reg. 49,788.

91.    The 2019 Rule rescinds the standards and procedures established in the 2016 Rule and replaces them with a regulatory scheme that acts as an effective bar to relief for borrowers who have been harmed by institutional misconduct.

92.    One overarching consideration cited by ED as justifying its rescission of the 2016 Rule and issuance of the new regulations is ED's belief that, without its imposition of impediments to borrower relief, borrowers will submit a massive number of "frivolous" and "unsubstantiated" claims. *See, e.g.*, 84 Fed. Reg. 49,800-01, 49,861, and 49,888. Indeed, throughout the text of the 2019 Rule, ED portrays students who seek borrower defense relief as irresponsible and acting in bad faith, claiming that regulations must be designed to prevent "giving students an opportunity to complete their education and raise alleged misrepresentations to avoid paying for that education." 84 Fed. Reg. 49,793.

93.    ED's assertion that borrowers have submitted a large number of frivolous claims is wholly unsubstantiated. There is simply no record evidence that students have used—or would use—the borrower defense process to complete their education and then inappropriately raise alleged misrepresentations to avoid paying for that education.

94.    Furthermore, ED's attempt to justify its position that the 2016 Rule is insufficient to prevent frivolous claims is based on factual errors. Throughout the 2019 Rule, ED repeatedly cited to its past experience processing borrower defense claims. *See, e.g.*, 84 Fed. Reg. 49,800-801, 49,884. In so doing, ED created the misimpression that it had experience reviewing a large number of claims under the 2016 Rule. In practice, ED had not yet approved or denied a single claim under the 2016 Rule at the time the 2019 Rule was published. *See, e.g.*, Testimony of Sec. DeVos Responding to Questions Submitted by Senator Patty Murray, at 20-21 (June 13, 2019), https://www.help.senate.gov/imo/media/doc/SenMurrayQFRresponses32819LHHShearing.pdf.

95.     Nevertheless, in order to advance ED's goal of limiting borrowers' ability to seek and obtain relief, the 2019 Rule: (1) significantly narrowed the institutional misconduct that can serve as a basis for a borrower defense claim; (2) established an onerous requirement that borrowers must demonstrate financial harm beyond the burden of their student loan debt; (3) established insurmountable evidentiary requirements and claims processes for borrowers asserting borrower defenses; (3) eliminated critical disincentives for institutional misconduct; (4) eliminated the group discharge process; (5) eliminated automatic closed school discharges; (6) eliminated conditions on schools' use of arbitration agreements and class action waivers; and (7) eliminated repayment rate and financial protection disclosure requirements.

96.     Each of these changes was premised on inaccurate, unsupported, and inconsistent claims. In promulgating these provisions, ED failed to consider relevant factors and record evidence, and further failed to adequately explain—and in some cases acknowledge—its dramatic reversal of its prior positions. The logical errors, unfounded assumptions, omissions and inconsistencies that undergird the 2019 Rule render the entire rule arbitrary and capricious. Additionally, ED's adoption of the specific changes described below each reflect ED's arbitrary and capricious rulemaking.

**A.     Establishment of Insurmountable Standards and Claims Processes**

97.     Under the 2016 Rule, ED explained that "the individual borrower defense process . . . is intended to be a simple process that a borrower may access without the aid of counsel." 81 Fed. Reg. 75,928. Under the 2019 Rule, far from maintaining a simple process, ED narrowed the grounds for borrower defense relief, established burdensome evidentiary standards requiring borrowers to prove knowing or reckless misconduct by their schools as well as that they suffered financial harm above and beyond incurring substantial student debt, converted the borrower defense claim process into an adversarial process which pits students directly against institutions, and imposed a new, unrealistic deadline for borrower submissions. Together, these changes establish insurmountable barriers to victimized borrowers seeking borrower defense relief.

1

### 1.  Unreasoned Limitation of Bases for Borrower Defense Claims

2        98.      In rescinding and replacing the standard set forth in the 2016 Rule, ED narrowed

3    the forms of institutional wrongdoing that may give rise to a borrower defense claim solely to

4    misrepresentations by the institution and further adopted a "more stringent definition of

5    misrepresentation," which excludes schools' negligent misrepresentations. 84 Fed. Reg. 49,805,

6    49,802-10. Under the 2019 Rule, misrepresentation is defined as "a statement, act, or omission by

7    an eligible school to a borrower that is false, misleading, or deceptive; that was made with

8    knowledge of its false, misleading, or deceptive nature or with a reckless disregard for the truth;

9    and that directly and clearly relates to enrollment or continuing enrollment at the institution or the

10   provision of educational services for which the loan was made." 84 Fed. Reg. 49,927 (new 34

11   C.F.R. § 685.206(e)(3)).

12       99.      The heightened scienter requirement incorporated in the 2019 Rule's new standard

13   is at odds with ED's "longstanding position that a misrepresentation does not require knowledge

14   or intent on the part of the institution." 81 Fed. Reg. 75,937. ED failed to provide a reasonable

15   explanation for its change of position.

16       100.     In fact, ED's justification for its narrowed definition of misrepresentation

17   demonstrates the unreasonableness of its new standard. To illustrate the type of misconduct that

18   would no longer form the basis for a borrower defense claim, ED provided the example of "a

19   school [that] erroneously represented State licensure eligibility requirements for a particular

20   profession" where the school was unaware of changes to state law. 84 Fed. Reg. 49,805-06. A

21   student's ability to satisfy the licensure requirements of their chosen profession is a crucial factor

22   in the decision about whether or not to enroll in a vocational program. ED offered no explanation

23   for why the costs of providing incorrect information about such a material issue should be borne

24   by the injured student rather than the school that provided the misinformation.

25       101.     In limiting the bases for borrower defense claims under the 2019 Rule solely to

26   institutions' knowing or reckless misrepresentations, ED unreasonably ignored the broad range of

27   abusive practices that predatory schools employ.

28       102.     The 2019 Rule eliminated provisions of the 2016 Rule that established as bases for

19

1    borrower defense claims a wide range of unfair and abusive practices that do not constitute

2    "misrepresentations" under the definition of the 2019 Rule, including: a school's material breach

3    of an enrollment agreement, use of high-pressure sales tactics, hiring of unqualified instructors,

4    and enrollment of students who do not meet requirements for obtaining professional employment.

5    All of these practices cause serious harm to borrowers, leaving them with substantial debt and an

6    education of little to no value.

7        103.    Additionally, ED expressly eliminated sexual or racial harassment as grounds for

8    borrower defense claims because, according to ED, such harassment does not "directly and

9    clearly relate[] to the making of a loan or the provision of educational services by a school." 84

10   Fed. Reg. 49,802. ED failed to explain its divergence from its past position that harassment

11   "interferes with students' right to receive an education free from discrimination." *See* U. S. Dep't

12   of Educ., "Dear Colleague" Letter (April 4, 2011), at 1,

13   http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf.

14       104.    ED failed to respond to the significant evidence and comments showing that

15   "Latino and African American students, who are disproportionately concentrated in for-profit

16   colleges and harmed by predatory conduct," stand to be disproportionately harmed by changes in

17   the 2019 Rule. *See* 84 Fed. Reg. 49,794. Rather, ED merely asserted that the "final regulations

18   will benefit, not harm, all students, including Latino and African American students." 84 Fed.

19   Reg. 49,795.

20       105.    ED also eliminated provisions of the 2016 Rule that allowed borrowers to raise

21   borrower defense claims based on court judgments obtained by students against their schools for

22   violations of state consumer protection laws and enforcement actions brought by State Attorneys

23   General. To support eliminating these bases for a borrower defense, ED asserted that applying

24   state law could result in inconsistent results for borrowers in different states, and that state law

25   judgments could involve institutional conduct that has nothing to do with borrower defense

26   claims. 84 Fed. Reg. 49,801-02. ED failed to acknowledge that it had previously considered these

27   arguments and reached an opposite conclusion. ED also failed to acknowledge its elimination of

28   critical deterrence mechanisms engendered by its policy change.

106.    ED's unreasoned exclusion of numerous forms of harmful institutional misconduct as potential bases for a borrower defense unreasonably favors the interests of predatory schools over students and would deny relief to borrowers who have been indisputably harmed by their schools. The 2019 Rule inappropriately ignores record evidence demonstrating these harms, leaving borrowers without the protections they require and systematically eliminating disincentives for institutional misconduct.

### 2.    Arbitrary and Onerous Financial Harm Requirement

107.    The 2019 Rule incorporates an arbitrary and onerous requirement that borrowers who have successfully demonstrated that their schools engaged in egregious misconduct must then provide evidence of personal financial harm—other than the inherent harm of bearing the burden of invalid student loan debt. *See* 84 Fed. Reg. 49,818-22. In adopting this requirement, ED ignored considerable evidence and comments outlining the well-documented negative consequences facing borrowers who are deceived into taking out federal loans. ED also inappropriately discounted the opportunity costs those defrauded borrowers incur.

108.    ED's assertion that it "does not consider the act of taking out a Direct Loan . . . as evidence of financial harm to the borrower," 84 Fed. Reg. 49,927, marks a dramatic and unexplained departure from its previous position. On the basis of considerable evidence, ED previously took the position that the mere fact of incurring debt as a result of a school's misconduct posed serious harms to borrowers. Among them, ED recognized that the resulting debt burden "may decrease the long-term probability of marriage, increase the probability of bankruptcy, reduce home ownership rates, and increase credit constraints . . . ." 81 Fed. Reg. 76,051.

109.    ED's analysis of financial harm under the 2019 Rule is designed to ascertain—in ED's view—how much of the harm suffered by a student due to an institution's misrepresentation "is the result of a student's choices, behaviors, aspiration, and motivations." 84 Fed. Reg. 49,797. Throughout the text of the 2019 Rule, ED repeatedly suggested that borrowers' "workplace performance," decision to change careers, and/or decision to work part time or stay at home as a caregiver are the true sources of their financial difficulties, *see id.* at 49,790, 49,819-21, but failed

21

1  to cite any evidence for these characterizations of borrower defense applicants.

2      110.   ED's rationale for adopting the financial harm requirement is premised on the

3  unsubstantiated assumption that borrowers will file frivolous claims in its absence. Without

4  providing a rational explanation for abandoning its prior position, ED stated in the 2019 Rule that

5  "the financial harm standard is an important and necessary deterrent to unsubstantiated claims"

6  from students who may be "disappointed by the college experience or subsequent career

7  opportunities" and therefore decide to submit a borrower defense claim. 84 Fed. Reg. 49,819.

8  ED's assumption that borrowers are filing claims merely because they are disappointed is

9  inconsistent with the record. ED also failed to explain why its new financial harm standard would

10  be necessary to prevent such hypothetical claims from being filed, where the 2016 Rule also did

11  not permit borrowers to establish a borrower defense on the basis of "disappointment."

12      111.   In addition to imposing arbitrary obstacles on victimized borrowers, the 2019

13  Rule's financial harm requirement provides absolutely no guidance or standards for how a

14  borrower is meant to calculate the amount of monetary loss that "the borrower alleges to have

15  been caused" by the institutional misconduct. 84 Fed. Reg. at 49,928; 34 C.F.R.

16  § 685.206(e)(8)(v). It is entirely unclear how borrowers are supposed to calculate such losses

17  under ED's restrictive definition.

18      **3.   Unachievable Evidentiary Requirements**

19      112.   The new evidentiary requirements established in the 2019 Rule are impractical and

20  inconsistent with the nature of the interactions and information asymmetries between students and

21  institutions. Under the 2019 Rule's standards, a borrower has the burden of proving by a

22  preponderance of the evidence that a school knowingly or recklessly made a false, misleading, or

23  deceptive representation to the borrower. In adopting this standard, ED ignored considerable

24  evidence in the record demonstrating that the overwhelming majority of students harmed by their

25  schools lack the evidence necessary to meet this requirement.

26      113.   As a justification for its evidentiary requirements, ED asserted without

27  substantiation, that students would be able to address the challenges posed by its new standards

28  by insisting that their schools provide them with "written representations and documentation"

during the enrollment process. 84 Fed. Reg. 49,807. This conclusion is inconsistent with record evidence demonstrating that students typically lack the bargaining power to demand such written representations.

114.    Furthermore, the 2019 Rule does not describe how borrowers could, realistically, demonstrate that a school's statement was made with knowledge of its falsity or reckless disregard for its truth, particularly since students do not have access to their schools' internal documents or communications.

115.    Not only does the 2019 Rule create unreasonable obstacles for borrowers seeking to prove their school's misconduct, the rule imposes irrational requirements on borrowers seeking to demonstrate financial harm. For example, borrowers seeking to demonstrate financial harm by identifying periods of unemployment are required to prove that such periods of unemployment are "unrelated to national or local economic recessions." 84 Fed. Reg. 49,820. ED does not explain how a borrower seeking relief can be expected to demonstrate that their unemployment is unrelated to a "local economic recession," without employing sophisticated analysis that borrowers cannot be expected to undertake.

116.    In addition, to satisfy the requirements of proving financial harm, students must provide evidence that they were not to blame for their difficulty obtaining employment by demonstrating that their inability to maintain employment was not due to, *inter alia*, their failure to meet health requirements or termination unrelated to their education. 84 Fed. Reg. 49,928; 34 C.F.R. § 685.206(e)(8)(v). They must further provide documentary proof to demonstrate the measures they took to seek employment. *Id.* ED has not provided a rational justification for imposing these invasive requirements, which do not relate to an institution's misconduct.

117.    In adopting its new standard, ED failed to reasonably explain its dramatic departure from its previous view, expressed in the 2016 Rule, that it "d[oes] not agree that the [2016] standard will incent borrowers to assert claims of misrepresentation without sufficient evidence to substantiate their claims," and that this concern would be adequately addressed by the fact that "[b]orrower defense claims that do not meet the evidentiary standard will be denied." 81 Fed. Reg. 75,936. Likewise, there is no record evidence to support ED's claim that without the

23

2019 Rule's heightened requirements, students might "attempt to induce statements [from schools] that could then be misconstrued or used out of context to relieve borrowers who otherwise received an education from their repayment obligations." 84 Fed. Reg. 49,816-17. These baseless assertions cannot justify the imposition of insurmountable evidentiary standards on borrowers seeking relief.

### 4.    Imbalanced Adversarial Process

118.    In a further ill-explained departure from the 2016 Rule, ED converted the borrower defense process into an adversarial one. ED failed to provide a reasoned explanation for abandoning the position that borrower defense regulations must establish "a non-adversarial process"—meaning that students would *not* have to directly oppose schools in order to pursue borrower defense claims—to help "even[] the playing field for students" and reduce inequities in resources between borrowers and schools. 81 Fed. Reg. 75,962.

119.    In contrast to the 2016 Rule, under the 2019 Rule, individual borrowers are responsible for raising and proving borrower defense claims under the new evidentiary standards, while well-represented institutions are then given an opportunity to review the borrowers' evidence and are "invite[d] . . . to respond and to submit [their own] evidence." 84 Fed. Reg. 49,928 (34 C.F.R. § 685.206(d)(10)(i)); *see also id.* at 49,791-95 (discussing 34 C.F.R. § 685.206).

120.    The 2019 Rule failed to account for the critical resource disparities between borrowers and schools, including access to information and the ability to obtain representation.

### 5.    Arbitrary Statute of Limitations

121.    The 2019 Rule established an accelerated statute of limitations for both defensive and affirmative claims, requiring borrower defense claims to be submitted within three years from the date the borrower leaves school. 84 Fed. Reg. 49,822-24 (pertaining to 34 C.F.R. § 685.206(e)(6)).

122.    The three-year statute of limitations for defensive claims was not proposed in the 2018 NPRM that preceded the 2019 Rule. 83 Fed. Reg. 37,257 ("Under the proposed standard, a borrower may be able to assert a defense to repayment at any time during the repayment period,

once the loan is in collections, regardless of whether the collection proceeding is one year or many years after a borrower's discovery of the misrepresentation"), and 37,260 ("[t]he proposed regulations do not impose a statute of limitations on the filing of a borrower defense to repayment claim").

123.    Although the 2018 NPRM proposed a three-year time limit only for *affirmative* claims, *id.* at 37, 252, in the 2019 Rule, ED announced that it "was persuaded by the commenter who proposed that a three-year limitations period be put in place for both affirmative and defensive borrower defense claims." 84 Fed. Reg. 49,823. Apart from noting the existence of this change, *see* 84 Fed. Reg. 49,881 (Table 1) and 49,882, ED did not otherwise address or explain the discrepancy between the 2018 NPRM and the 2019 Rule.

124.    The imposition of a three-year statute of limitations on defensive claims is both patently unfair and entirely illogical. Because there is no corresponding time limit for ED to collect on student loans, the 2019 Rule could place borrowers in the position of being legally obligated to repay a loan that was conclusively procured illegally. Indeed, this is a likely outcome, since students will rarely face involuntary collections within three-years of leaving school.

125.    ED's own calculations demonstrate that the 2019 Rule's new statute of limitations will prevent borrowers with potentially meritorious claims from obtaining relief. According to ED, "[a]pproximately 30 percent of existing claims were submitted within 3-years or less." 84 Fed. Reg. 49,897. ED provided no reasoned basis for its decision to disqualify potentially 70% of victimized borrowers from seeking borrower defense relief. ED stated that it anticipates that the 2019 Rule will create an "incentive to file within the 3-year timeframe" and that it predicts that 70% (rather than 30%) of borrowers may submit in that timeframe based on existing data that 67% of borrowers submit within 5 years. *Id.* ED provides no support for this prediction and, in any event, no reasoned basis to disqualify potentially 30% of victimized borrower from seeking relief.

### 6.    Intentional Barriers to Relief for Harmed Borrowers

126.    ED does not hide its intention to limit relief to victims of institutional misconduct

25

through its changes to the borrower defense process. In the 2019 Rule, ED explicitly "recognize[d] that the borrower [success] percent changed significantly from the 2016 final rule" and acknowledge[d] that the 2019 Rule "will reduce the anticipated number of borrower defense applications" due "to changes in the process, *not due to changes in the type of conduct on the part of an institution that would result in a successful defense* [.]" 84 Fed. Reg. 49,897 (emphasis added).

127.    In discussing its anticipated cost-savings associated with the 2019 Rule, ED acknowledged that the 2019 Rule will "result in fewer successful defense to repayment applications as compared to the 2016 final regulations, and therefore fewer discharges of loans." 84 Fed. Reg. 49,890. ED further acknowledged that the 2019 Rule's removal of a group process "is a major contributor to the reduction" of successful claims, 84 Fed. Reg. 49,898, and that the three-year statute of limitations will procedurally disqualify at least 30% of meritorious claims. ED stated that only approximately 30% of existing claims were submitted within three years or less, but stated that it "anticipates that this share will increase when borrowers have the incentive to file within the 3-year timeframe." *Id.* at 49,897.

128.    ED's ten-year "budget impact" of the 2019 Rule confirms that the 2019 Rule's new borrower defense standard and process will be practically impossible for borrowers to meet. *See* 84 Fed. Reg. 49,894-95 (and Table 3). ED estimates that for-profit schools engage in approximately 7 times more institutional misconduct than public and private, non-profit institutions and that, over the ten-year period from 2020 to 2029, for between 7.7% and 11.6% of federal loans taken out to attend for-profit schools, the borrower will be the victim of school misconduct that meets ED's standard for borrower defense. *Id.* Nonetheless, while ED estimates that, over this same period, between 54.6% and 65% of these loans would be discharged under the 2016 Rule, it estimates that, over this same period, only between 3.47% and 5.25% of loans would be discharged under the 2019 Rule. 84 Fed. Reg. 49,895.

129.    In context, ED's "budget impact" indicates that for every $1,000,000 in Direct Loans taken out to attend a for-profit school, under the 2019 Rule, ED expects that approximately $100,000 will be eligible for discharge under ED's borrower defense standard, but, due to the

26

2019 Rule's procedural barriers and impediments, ED expects that only around $4,000 will actually be successfully discharged. ED's own estimates confirm that it has created an illusory process designed to limit, deny, and thwart relief to victimized borrowers.

130.    In its budgetary analysis, the 2019 Rule introduces a figure not part of the 2016 Rule, "Allowable Applications Percent," which functions to inflate the 2019 Rule's estimated borrower success rates. This figure "captures the [70%] of applications estimated to be made within the 3-year timeframe," by excluding from ED's estimated success rates the 30% not made, which would necessarily have been denied as untimely, thus driving down the success rates. 84 Fed. Reg. 49,894. But, as discussed, ED's assertion that 70% of borrowers will submit a claim within three years is overstated and contradicted by past agency experience that only 30% of borrowers actually do so. Accordingly, if ED applied an "Allowable Applications Percent" consistent with ED's actual experience, the 2019 Rule would have estimated success rates between 1.485% to 2.25% over the ten-year period from 2020 to 2029. In other words, ED's unsupported and arbitrary assumptions obscure the fact that, based on ED's own data, the 2019 Rule's success rates are really approaching 0%.

131.    ED acknowledges that the 2019 Rule, as compared to the 2016 Rule, will "require more effort on the part of individual borrowers to submit a borrower defense application." 84 Fed. Reg. 49,897. In total, ED estimates that the 2019 Rule's borrower defense process will reduce relief to borrowers by $512.5 million *annually* versus the 2016 Rule, while at the same time conceding that ED does not expect a material change in institutional misconduct. 84 Fed. Reg. 49,893.

**B.    Elimination of Critical Disincentives to Institutional Misconduct**

132.    The 2019 Rule eliminated numerous measures designed to deter institutional misconduct and ensure that the costs of institutional misconduct are borne by the schools that engage in that misconduct. ED's rescission of these measures is inconsistent with its previous position that borrower defense regulations should promote "improved conduct of schools by holding individual institutions accountable and thereby deterring misconduct by other institutions." 81 Fed. Reg. 75,927.

27

133.    ED's changed position on the importance of institutional accountability is confirmed by ED's erroneous assumption that benefits to borrowers necessarily constitute taxpayer costs. This assumption, which underlies the entire 2019 Rule, fails to acknowledge that shifting costs to predatory institutions would result in savings to *both* borrowers and taxpayers. Notably, ED's current position is unsubstantiated by record evidence and is contradicted by the evidence that supported the 2016 Rule.

134.    Under both the 2016 Rule and the 2019 Rule, ED is—at least in theory—entitled to recoup from schools the costs associated with their students' approved borrower defense claims. However, by considerably narrowing the institutional misconduct that entitles borrowers to relief and by establishing insurmountable evidentiary requirements, ED shifted the costs of schools' abusive conduct away from schools and onto borrowers. In so doing, ED eliminated critical disincentives to future misconduct. ED failed to adequately address the loss of this deterrent and its change of position regarding the importance of creating disincentives for institutional misconduct.

135.    The 2019 Rule also diminishes and impedes ED's ability to recoup the cost of successful borrower defense claims from the schools that engaged in misconduct in comparison to the 2016 Rule. In particular, the 2019 Rule imposed a five-year time limit on ED's initiation of recoupment from an institution following a successful borrower defense claim, 84 Fed. Reg. 49,838-39. Under the 2016 Rule, there was "no limit on the time in which ED could take recovery action if the institution received notice of a claim within the three-year [mandatory record retention] period." 81 Fed Reg. 75,955. ED failed to adequately explain its change of position in introducing the 5-year limitations period.

136.    In addition, the 2019 Rule unreasonably affords institutions a second opportunity to challenge the merits of borrower defense claims in the recoupment process—even though the 2019 Rule gives schools the initial right to challenge a borrower defense claim at the time it is made, and though the 2019 Rule does not afford borrowers the opportunity to appeal a Departmental denial. *See* 84 Fed. Reg. 49,839.

137.    The 2019 Rule also dramatically weakens the financial-responsibility standards

28

established in the 2016 Rule. The 2016 Rule required at-risk schools to set aside funds to cover potential taxpayer losses. The 2016 Rule identified mandatory "triggers" that serve as indicia of financial instability. *See* 81 Fed. Reg. 75,978-99. When these triggering events occurred, the 2016 Rule required schools to make an alternative showing of financial responsibility and capacity, such as providing a letter of credit demonstrating that a private lender will supply funds to the school to cover any taxpayer losses. *Id.* In the 2019 Rule, ED narrowed the class of events that constitute mandatory "triggers," eliminating triggers such as the existence of pending borrower defense claims and pending lawsuits brought by State Attorneys General and borrowers. *See* 84 Fed. Reg. 49,860-69.

138.    ED justified the elimination of these triggers on the ground that the "consequences" of these triggering events "are uncertain." 84 Fed. Reg. 49,860. ED's reasoning relies on its assertion that borrowers submit a large number of "unsubstantiated" claims. *See, e.g.*, 84 Fed. Reg. 49,861. This assertion is unsupported by any evidence in the record, and ED's reasoning is inconsistent with its claim that the 2019 Rule's new borrower defense standard will deter and prevent unsubstantiated claims.

139.    In eliminating pending borrower defense claims as mandatory triggers, 84 Fed. Reg. 49,865, ED irrationally eliminated important predictors of a school's potential financial liabilities. Pending borrower defense claims that are substantially similar to those that have already been approved are meaningful indicia of a school's financial instability. The elimination of such triggers is particularly damaging in light of ED's years-long delay in processing borrower defense claims and its elimination of the group discharge process, requiring individuals with identical claims to submit separate applications. ED's exclusion of such claims as mandatory triggers is irrational and ignores the record evidence.

140.    ED also eliminated as mandatory triggers lawsuits brought against schools by state and federal agencies and borrowers. 84 Fed. Reg. 49,864-65 (discussing changes to 34 C.F.R. § 668.171(c)(1)(i) as established by the 2016 Rule). Under the 2016 Rule, such lawsuits constituted triggering events even while pending, so long as the plaintiff's claim had survived a motion for summary judgment. *Id.* In issuing the 2016 Rule, ED reasoned that:

[I]gnoring the threat until judgment is entered would produce a seriously deficient assessment of ability to meet financial obligations, and worse, would delay any attempt by [ED] to secure financial protection against losses until a point at which the institution, by reason of the judgment debt, may be far less able to supply or borrow the funds needed to provide that protection.

81 Fed. Reg. at 75,990. ED's unexplained and unreasoned rejection of these, and other, mandatory triggers eliminated important disincentives to institutional misconduct.

141.    ED acknowledged that the reduction in borrower defense applications under the 2019 Rule will be a "benefit[] to institutions" because it will result in "a decrease in the number of reimbursement requests resulting from Department-decided loan discharges based on borrower defenses." 84 Fed. Reg. 49,890. Additionally, according to ED, the 2019 Rule's "changes to the financial responsibility triggers may reduce recoveries relative to the 2016 final rule" and "could increase the costs to taxpayers." 84 Fed. Reg. 49,893.

142.    In total, ED estimates that reimbursement from institutions will be reduced by $153.4 million *annually*, based on changes to institutional accountability between the 2016 Rule and 2019 Rule. 84 Fed. Reg. 49,893; *see also, e.g.*, *id.* at 49,895 (reduction in reimbursement "reflects the removal or modification of some financial responsibility triggers"); *id*. at 49,896 ("changes in the timeframe for recovery and changes in the triggers in the [2019 Rule] will reduce the percentage of gross claims recovered from institutions"). ED has accordingly shifted a substantial financial burden to taxpayers without reasoned explanation.

## C.    Elimination of the Group Discharge Process

143.    The 2019 Rule rescinded the group discharge process established by the 2016 Rule without providing a reasoned explanation for ED's change of position and without considering the harms posed to borrowers and taxpayers by this change. *See* 84 Fed. Reg. 49,789-800.

144.    When it issued the 2016 Rule, ED concluded that a group process "will facilitate the efficient and timely adjudication of not only borrower defense claims for large numbers of borrowers with common facts and claims, but will also conserve ED's administrative resources by also adjudicating any contingent claim ED may have for recovery from an institution." 81 Fed. Reg. 75,965

145.    In issuing the 2019 Rule, ED adopted a contradictory position, asserting that

30

"[i]nitiating the group discharge process is extremely burdensome on [ED] and results in inefficiency and delays for individual borrowers." 84 Fed. Reg. 49,879. ED also claimed that the 2019 Rule would result in "fewer [borrower defense claims] than that expected under the 2016 final regulations" and that "a smaller number of claims" means that "[b]orrowers are more likely to have their [claims] processed and decided more quickly . . . ." 84 Fed. Reg. 49,888. However, ED failed to acknowledge that a group process would similarly result in a smaller number of adjudications and did not explain why the same attendant benefits of speed and efficiency would not similarly follow.

146.   In seeking to justify this change of policy, ED relied on the wholly unsubstantiated assertions that group discharges place an undue burden on taxpayers, *see* 84 Fed. Reg. 49,879, and that there is "evidence of[] outside actors attempting to personally gain from the bad acts of institutions as well as unfounded allegations," by submitting group claims, 84 Fed. Reg. 49,798. ED failed to identify any such "actors" or "evidence."

147.   ED also offered no reasoned explanation for its refusal to consider group evidence submitted by State Attorneys General. ED merely noted that ED "will not be compelled to take action at the recommendation or petition of a State AG . . . nor will [ED] automatically treat State AG Submissions as group claims." 84 Fed. Reg. 49,800. ED instead recommended that State Attorneys General direct concerns about a particular institution to their state agencies. *See id.* ED ignored the central role that State Attorneys General have played in providing ED with evidence of institutional misconduct and in assisting state residents in obtaining and proving entitlement to borrower defense relief.

148.   ED's primary explanation for its elimination of the group discharge process is its conclusion that the 2019 Rule's new evidentiary standard necessitates individual applications and claim adjudications. *See* 84 Fed. Reg. 49,798-800, 49,888. But ED failed to acknowledge that it could have retained a group discharge process predicated on a different process and requirements than those it created for individual claims, or that it could maintain a group discharge process for the purpose of determining institutional misconduct even under its new heightened standard. ED's stated rationale does not justify its total abandonment of a group discharge process. *See, e.g.*, 84

31

Fed. Reg. 49,799.

149.    Under ED's new policy, even in the case of widespread evidence of institutional misrepresentations, ED will only grant relief where "each borrower" has the "ability to demonstrate that institutions made misrepresentations with knowledge of [their] false, misleading, or deceptive nature or with reckless disregard." 84 Fed. Reg. 49,799. ED has not offered—nor could it offer—a reasonable explanation for denying relief to a borrower merely because the borrower is unable to marshal their own evidence under ED's new strict standard, even where ED is already in possession of such evidence. To limit borrower relief in such circumstances is patently irrational and serves only to unfairly deprive borrowers of relief to which they are entitled.

**D.    Elimination of Automatic Closed School Discharge Process**

150.    In the 2019 Rule, ED eliminated the automatic closed school discharge process created by the 2016 Rule. *See* 84 Fed. Reg. 49,846-55 (discussing new 34 C.F.R. § 685.214).

151.    Under the 2016 Rule, 34 C.F.R. § 685.214(c)(2)(ii), Title IV loans were automatically discharged for students who did not re-enroll in a different Title IV-eligible school within three years of the closure of their prior school. 81 Fed. Reg. 76,036-39. By eliminating this automatic process, the 2019 Rule requires borrowers to affirmatively apply for a closed school discharge, which includes submitting a certification that the borrower declined to participate in a teach-out program or to transfer to another institution. 84 Fed. Reg. 49,846.

152.    Regarding its change of position from the 2016 Rule, ED stated only that "providing automatic closed school discharges to borrowers runs counter to the goals of these final regulations, which include encouraging students at closed or closing schools to complete their educational programs, either through an approved teach-out plan, or through the transfer of credits separate from a teach-out." 84 Fed. Reg. 49,847. ED does not explain how imposing an affirmative discharge application process, rather than an automatic discharge, would be any more likely to encourage borrowers to engage in a teach-out or transfer to another school.

153.    While ED claims that applying for a closed school discharge "is not overly burdensome for borrowers," 84 Fed. Reg. 49,848, this claim is contradicted by evidence in the

32

record, which ED failed to address. ED stated only that, "[w]hile there may be disagreement about whether automatic closed school loan discharge is better for borrowers than closed school loan discharges provided to students who apply for such a benefit, [ED] has met the required legal standard for proposing and making this change." 84 Fed. Reg. 49,848. This is not a reasoned explanation.

154.    ED further asserted that some students may not wish to have their loans automatically discharged "given that there may be tax consequences," or because they "may be satisfied with the education they received prior to the school's closure and may have left the school in order to meet certain family or work obligations, but wish to transfer those credits in the future." 84 Fed. Reg. 49,848. ED cited no support for this speculative factual claim.

155.    ED also failed to acknowledge then-existing Internal Revenue Service ("IRS") guidance suggesting that closed-school discharges would not result in "tax consequences." *See, e.g.*, Rev. Proc. 2015-57, 2015-51 I.R.B. 863, Rev. Proc. 2017-24, 2017-7 I.R.B. 916, Rev. Proc. 2018-39, 2018-34 I.R.B. 319. In January 2020, the IRS clarified that a safe harbor exists for taxpayers who receive closed school discharges, disproving ED's "tax consequences" rationale. Rev. Proc. 2020-11, http://www.irs.gov/pub/irs-drop/rp-20-11.pdf.

156.    In addition to eliminating automatic closed school discharges, ED also eliminated the provision in the 2016 Rule that required closing schools to provide students with information about the availability of the closed school discharge process. 84 Fed. Reg. 49,847. In so doing, ED stated only that it is "ED's, not the school's burden to provide this information to students." *Id*. This explanation is inconsistent with ED's stated goal of "ensuring students have access to the information they need to be smart consumers," 84 Fed. Reg. 49,818.

157.    In eliminating this disclosure requirement, ED increased the likelihood that students will be unaware of the opportunity to obtain a closed school discharge, and therefore remain burdened by unlawful loans despite being eligible for a discharge. ED failed to acknowledge or address this detrimental impact on borrowers.

### E.   Elimination of Conditions on the Use of Arbitration Agreements and Class Action Waivers

159.   In the 2019 Rule, ED eliminated provisions of the 2016 Rule that placed conditions on schools' use of mandatory predispute arbitration agreements and class action waivers. ED rescinded these provisions and replaced them with a requirement that schools merely disclose the existence of arbitration agreements and class action waivers. *See* 84 Fed. Reg. 49,839-46 (relating to new 34 C.F.R. §§ 668.41, 685.304).

160.   In the 2016 Rule, ED explicitly recognized the importance of preserving students' right to file suit in court, concluding:

> [E]vidence showed that the widespread and aggressive use of class action waivers and predispute arbitration agreements coincided with widespread abuse by schools over recent years, and effects of that abuse on the Direct Loan Program. It is undisputable that the abuse occurred, that a great many students were injured by the abuse, that the abusive parties aggressively used waivers and arbitration agreements to thwart timely efforts by students to obtain relief from the abuse, and that the ability of the school to continue that abuse unhindered by lawsuits from consumers has already cost the taxpayers many millions of dollars in losses and can be expected to continue to do so.

81 Fed. Reg. 76,025.

161.   ED failed to reasonably explain its departure from this prior position or to address the fact that relegating the adjudication of institution misconduct to private, confidential arbitration deprives ED of information necessary to safeguard taxpayer funds. ED merely "acknowledge[d] that arbitration proceedings are not public forums in the same way as traditional court proceedings," and asserted that, "public hearings, while transparent, have serious drawbacks" including, *inter alia*, the potential for "serious negative impact on an institution's reputation." 84 Fed. Reg. 49,843. ED's failure to address the benefits of public judicial proceedings and class actions is unreasonable and leaves unaddressed a critical consideration underlying the 2016 Rule.

162.   In support of its elimination of conditions on the use of predispute arbitration agreements, ED pointed to a single magazine article from 2012 titled, "Benefits of Arbitration for Commercial Disputes,"—an article which does not relate to students, education, or borrowers in

the education context—to assert that arbitration may be beneficial for borrowers. 84 Fed. Reg. 49,841. ED's failure to address the incongruity between this article and the relevant context is not reasonable. Moreover, ED's conclusions are unsupported by the voluminous record before it.

163.    Responding to commenters raising concerns about the elimination of these provisions, ED stated that, if the "final regulations would put students at a 'distinct legal disadvantage' against schools that 'can afford high quality legal counsel,' it is difficult to understand how this same concern would not apply to a complex, expensive court proceeding," and asserted that arbitration may serve to level the playing field in such instances. 84 Fed. Reg. 49,842. ED failed to address the fact explained by numerous commenters that class actions—and not one-off arbitrations, where individuals are still frequently unrepresented—are the traditional vehicles for solving such imbalances in power and representation between the parties. On this point, ED stated only that "concern regarding an individual's ability to acquire representation [in light of a class action waiver] is mitigated by ED's proposal to allow students and schools to employ internal dispute resolution options, where legal representation is not necessary." 84 Fed. Reg. 49,844.

164.    ED's rationalization fails to address the fact that the 2016 Rule created limitations only on *mandatory pre-dispute* arbitration clauses and did not prohibit students and schools from *voluntarily* choosing arbitration once a dispute arises. In response, ED now speculates that "while institutions may have continued to provide voluntary arbitration, schools may not have made it obvious to students how to avail themselves of arbitration opportunities." 84 Fed. Reg. 49,888. Unsupported conjecture is not a reasoned basis for agency action.

165.    ED asserted that class actions "benefit the wrong individuals, that is, lawyers and not wronged students." 84 Fed. Reg. 49,844-45. This position is at odds with ED's conclusion in the 2016 Rule that it disagreed with commenters that the 2016 Rule "will create opportunities for [abuse by] plaintiffs' attorneys." 81 Fed. Reg. 75,973. ED based its change of position on a single article from a partisan advocacy group, which is not relevant to the student borrower context, but rather focuses on "the need for reform" to limit "class-action and mass-tort abuses." 84 Fed. Reg. 49,845, n.134 (*citing* James R. Copland, *et al.,* ''Trial Lawyers, Inc. 2016,'' Manhattan Institute,

at 5, https://media4.manhattaninstitute.org/sites/default/files/TLI-0116.pdf.) ED did not explain why this inapplicable article outweighed ED's prior, reasoned determinations and the considerable evidence submitted by commenters illustrating the benefits of class actions for low-income consumers. Nor did ED further justify its dramatic change of position from the 2016 Rule.

166.    ED's conclusion that requiring schools to disclose their use of mandatory predispute arbitration agreements and class action waivers will adequately protect borrowers is also contrary to substantial evidence and ED's own prior conclusions. *See* 84 Fed. Reg. 49,845-46. ED previously explained that "[t]he literature regarding use of arbitration agreements in consumer transactions provides repeated anecdotal and empirical evidence that consumers commonly lack understanding of the consequences of arbitration agreements" and that "it is unrealistic to expect the students to understand what arbitration is and thus what they would be relinquishing by agreeing to arbitrate." 81 Fed. Reg. 76,028. In the 2019 Rule, ED stated only that it "rejects the assertion that students are unable to appreciate the rights they are giving up," but failed to provide a reasoned basis for *why* it now believes that disclosure of predispute arbitration agreements and class waivers will provide sufficient protection to borrowers. 84 Fed. Reg. 49,845.

### F.    Elimination of Repayment Rate and Financial Protection Disclosure Requirements

167.    In the 2019 Rule, ED eliminated the provisions of the 2016 Rule that required loan repayment rate and financial protection disclosures by institutions. 84 Fed. Reg. 49,876 (discussing ED's elimination of 34 C.F.R. § 668.41(h) and (i) of the 2016 Rule, which established such disclosures).

168.    ED's only explanation for eliminating the loan repayment rate disclosure was logistical. 84 Fed. Reg. 49,876. ED asserted that the repayment rate disclosures required by the 2016 Rule used data gathered pursuant to another regulation, the Gainful Employment Rule, which ED had recently rescinded. *Id.* ED failed to explain why it chose not to adopt an alternate method for calculating loan repayment rates.

169.    In eliminating these disclosures, ED asserted that, "[a]s a general matter, we

consider repayment rates to be an important factor students and their families may consider when choosing an institution," but that "[w]e believe that any benefit that a student may derive from knowing the loan repayment rate for a proprietary institution is negated by not knowing the comparable loan repayment rate at a non-profit or public institution." 84 Fed. Reg. 49,876. This assertion wholly fails to acknowledge or explain ED's complete change of position from the 2016 Rule, which underlined the "fundamental differences" between these types of schools, and explained that ED "appl[ied] the loan repayment rate disclosure only to the for-profit sector primarily because the frequency of poor repayment outcomes is greatest in this sector." 81 Fed. Reg. 75,934. Nor does this explanation address the evidence on which ED based its prior position.

170. With respect to financial protection disclosures, ED explained that although some prospective students find information from financial protection disclosures helpful, "on balance" the disclosures "could tarnish the reputation" of for-profit schools that are in a precarious financial condition. 84 Fed. Reg. 49,876. ED did not explain its change of opinion in this regard from the 2016 Rule, in which it explained that requiring such disclosures simultaneously disincentivizes risky financial behavior by these institutions and protects students and taxpayers. 81 Fed. Reg. 75,934-35.

171. ED's elimination of these mandatory disclosures is inconsistent with its global assertions in the 2019 Rule, in which it claims to "seek[] to prevent borrower defense claims before they arise by disseminating information about various institutions that will help students make informed decisions based upon accurate data." 84 Fed. Reg. 49,793.

## VI. ED'S RESCISSION OF THE 2016 RULE AND REPLACEMENT WITH THE 2019 RULE HARMS THE STATES

172. ED's rescission of the 2016 Rule and issuance of the 2019 Rule causes concrete and particularized injury to the States by directly and indirectly harming their public colleges and universities, the state fiscs, and the economic well-being of their residents.

### A. Harm to the States' Public Colleges and Universities

173. The States' public colleges and universities are competitors of for-profit schools. In particular, the States' community colleges compete for and seek to serve prospective and

enrolled students of for-profit schools.

174.    The States' community-college systems are economic actors that spend billions of dollars each year educating their residents. For example, with more than 2.1 million students at 115 colleges, the California Community Colleges is the largest system of higher education in the nation with an annual budget of over $10 billion.

175.    The States have an interest in promoting opportunities for education in their public colleges and universities and in deterring predatory schools, including for-profit schools, from unfairly competing with them. The borrower-defense provision of the HEA, 20 U.S.C. § 1087e(h), is a critical deterrent to the misconduct carried out by predatory institutions, including for-profit schools. ED's implementation of this HEA provision in the 2016 Rule created meaningful disincentives for institutional misconduct. The 2019 Rule eliminated these deterrence mechanisms. Moreover, the financial accountability metrics in the 2016 Rule, which were weakened significantly by the 2019 Rule, jeopardized the eligibility of predatory institutions to participate in Title IV aid and thus their ability to operate.

176.    ED's rescission of the 2016 Rule and replacement with the 2019 Rule impairs the educational missions of the States' public colleges and universities. For example, the educational mission of Massachusetts's public colleges and universities is provided by statute and requires the institutions to "strengthen the access of every individual in the commonwealth to education opportunities." M.G.L. c. 15A § 1. It is within the mission of the Massachusetts Department of Higher Education to ensure that "the programs and services of Massachusetts higher education . . . meet standards of quality commensurate with the benefits it promises and must be truly accessible to the people of the Commonwealth in all their diversity." https://www.mass.edu/about/aboutdhe.asp.

177.    Similarly, it is within the mission of California's public colleges and universities to enroll a "diverse and representative student body," with "[p]articular efforts . . . made with regard to those who are historically and currently underrepresented in both their graduation rates from secondary institutions and in their attendance at California higher educational institutions." Cal. Educ. Code § 66010.2. Restoring access to higher education for those who need it is also a

38

major system priority for California Community Colleges. On September 21, 2015, the Board of

Governors of the California Community Colleges requested an additional $175 million in funding

in 2016-17 for increased access for approximately 70,000 students. The request was specifically

made to accommodate additional, expected enrollments from veterans returning from Iraq and

Afghanistan, and the closure of several for-profit schools, including Corinthian.

178.    In Colorado, the general assembly has declared "that the provision of a higher or

career and technical education for all residents of this state who desire such . . . is important to the

welfare and security of this state and nation and, consequently, serves an important public

purpose . . . ." C.R.S. §23-3-102. An analysis of 2015 College Scorecard data shows that 16% of

Colorado's undergraduate population attends for-profit schools, higher than the nationwide

average (10%). Enrollment at Colorado's for-profit institutions is disproportionately low-income

(57%) relative to public and private institutions. *See Center for Responsible Lending,*

*"Colorado's For-Profit College Student Struggle to Graduate, Pay Off Steep Debt Burdens,"*

*Jan. 2017*. https://www.responsiblelending.org/research-publication/colorados-profit-college-

students-struggle-graduate-pay-steep-debt-burdens. Three years later, the data indicated little had

changed. *See The State of For-Profit Colleges, January 2019, at*

https://www.responsiblelending.org/es/research-publication/state-profit-colleges.

179.    Connecticut's higher education policies seek to achieve the goals of "(A) reducing

socioeconomic disparities, (B) reducing the achievement gap between whites and minorities . . .

(C) improving the lives of residents living in the most urbanized areas of the cities of the state . . .

(D) ensuring that the quality of postsecondary education is improved . . . [and] ensur[ing] that

higher education is affordable for the residents of the state. . . ." Conn. Gen. Stat. § 10a-11c. The

goals of Connecticut's public college system include "ensuring that no qualified person be denied

the opportunity for higher education on the basis of age, sex, gender identity or expression, ethnic

background or social, physical or economic condition . . . to provide opportunities for education

and training related to the economic, cultural and educational development of the state . . . to

assure the fullest possible use of available resources in public and private institutions of higher

education . . . ." Conn. Gen. Stat. § 10a-6 (b); *see also* Conn. Gen. Stat. § 10a-11 (strategic plan to

ensure racial and ethnic diversity and minority advancement program); Conn. Gen. Stat. § 10a-10

(establishment of Office of Educational Opportunity to increase "state-wide efforts to increase

enrollment, retention and graduation of disadvantaged students"); Conn. Gen. Stat. § 10a-11b (c)

(higher education strategic master plan to consider "developing policies to promote and measure

retention and graduation rates of students . . . [and] addressing the affordability of tuition at

institutions of higher education and the issue of increased student indebtedness").

180.    Delaware's higher education mission is elaborated in the establishment of the

Higher Education office. By establishing this office, Delaware upholds the importance of

ensuring that "higher education is accessible and affordable" and helping "facilitate families

saving for college." Del. Code Ann. tit. 14, § 181 (West). Delaware's General Assembly has

emphasized these principles, affirming that "students attending institutions of higher

education . . . have reasonable financial alternatives to enhance their access. . ." and that such

access assists youths in "achieving the optimum levels of learning and development." Del. Code

Ann. tit. 14, § 9201 (West).

181.    The District of Columbia has also demonstrated its commitment to higher

education by enacting a variety of laws designed to protect "the quality of postsecondary

education," D.C. Code § 38-1301(1), "ensure [the] authenticity and legitimacy of [post-

secondary] educational institutions," *id.* § 38-1303, and to provide financial aid programs that

will "enable[] college-bound residents of the District of Columbia to have greater choices among

institutions of higher education." *Id.* § 38-2701. To achieve these important educational goals, the

District has established a wide variety of grant and loan programs that provide student financial

aid. *E.g.*, D.C. Code §§ 38-1207.02, -2702, -2704, -2733(a); 29 DCMR §§ 7000 – 7099. Several

of these programs only provide aid to students attending schools eligible for Title IV funding.

*E.g.*, D.C. Code §§ 38-2702(c)(1), -2704(c)(1), -2731(3)

182.    Hawaiʻi promotes access to quality education through a program of financial

assistance for students attending universities and community colleges within the University of

Hawaii System. Hawaii Revised Statutes §§ 304A-501 to -506. The University of Hawaii System

includes three universities, seven community colleges, and community-based learning centers

across Hawai'i. Although University of Hawaii community colleges are among the most

affordable public two-year institutions in the nation, low-income families would need to spend

nearly a quarter of family income to pay for attending a two-year public institution full

time. Institute for Research on Higher Education, "*College Affordability Diagnosis: Hawaii*,"

2016, http://www2.gse.upenn.edu/irhe/affordability-diagnosis. In its continued commitment to the

development of an educated labor force and engaged citizenry, Hawai'i established a permanent

Hawaii Community College Promise Program in 2018 to "provide scholarships for the unmet

direct cost needs of qualified students enrolled at any community college campus of the

University of Hawaii." HRS § 304A-506. In the 2018-2019 fiscal year, Hawai'i appropriated

$700,000 to the Promise Program.

183.    The Illinois General Assembly has declared that "the provision of a higher

education for all residents of this State who desire a higher education and are properly qualified

therefor is important to the welfare and security of this State and Nation and, consequently, is an

important public purpose." 110 ILCS 947/5. The General Assembly also made findings that the

benefits to Illinois are even greater when Illinois students attend state institutions. These benefits

include the importance of increased enrollment and tuition, and the furtherance of State efforts at

creating a highly trained workforce. 110 ILCS 947/65.100(a).

184.    In Maryland, the General Assembly created the University System of Maryland

"[i]n order to foster the development of a consolidated system of public higher education, to

improve the quality of education, to extend its benefits and to encourage the economical use of

the State's resources." Md. Code Ann., Educ. § 12-101. Maryland also has 16 community

colleges, one of which is the Baltimore City Community College whose purpose is to "provide

quality, accessible, and affordable education to the citizens of Baltimore in the areas of basic

skills, technical and career education, continuing education, and the arts and sciences." *Id.* at

§ 16-501. Although not included in the University System of Maryland, St. Mary's College of

Maryland, is "a public honors college, located in St. Mary's County" (*Id.* at § 14-401) and

Morgan State University "is an instrumentality of the State and a public corporation" that

performs an "essential public function" of, among other things, the "development and delivery of

1   comprehensive and high-quality academic programs and services to its university community and

2   the citizens of Maryland, particularly the citizens of the Baltimore region." *Id.* at § 14-101.

3       185.    In Minnesota, the legislature has declared that "Minnesota's higher education

4   investment is made . . . to ensure quality by providing a level of excellence that is competitive on

5   a national and international level, through high quality teaching, scholarship, and learning in a

6   broad range of arts and sciences, technical education, and professional fields." Other goals of

7   Minnesota's investment in public and community colleges are "to promote democratic values and

8   enhance Minnesota's quality of life by developing understanding and appreciation of a free and

9   diverse society," to provide "an opportunity for all Minnesotans, regardless of personal

10  circumstances, to participate in higher education", and "to enhance the economy by assisting the

11  state in being competitive in the world market, and to prepare a highly skilled and adaptable

12  workforce that meets Minnesota's opportunities and needs." Minn. Stat. § 135A.011.

13      186.    The educational mission of the Nevada System of High Education is "to provide

14  higher education to the citizens of the state at an excellent level of quality consistent with the

15  state's resources." https://nshe.nevada.edu/tasks/sites/Nshe/assets/File/BoardOfRegents/

16  Agendas/2016/jan-mtgs/bor-refs/BOR-3b.pdf.

17      187.    Likewise, New Jersey "is committed to making world-class education accessible

18  and affordable for all New Jersey students." N.J.S.A. 18A:71B-35. The Legislature has

19  designated the State's institutions of higher education as "one of the most valuable and

20  underutilized resources in the State" and noted that the State "benefits from a coordinated system

21  of higher education that includes public and private institutions which offer a variety of programs

22  with a range of choices and which addresses the needs of the State including its citizens and

23  employees." N.J.S.A. 18A:3B-2. New Jersey's goals for its system of higher education include

24  "affordability and accessibility for all students, institutional excellence, and effectiveness in

25  addressing the societal and economic needs of the state." Id. The Legislature understands that "it

26  is necessary for the State's citizens to acquire an education beyond the secondary level in order to

27  succeed during the 21st century. A well-trained and educated population, moreover, is vital to

28  New Jersey's efforts to attract and retain highly skilled businesses, and to ensure the State's

continued economic well-being." N.J.S.A. 18A:71B-82. The Legislature has therefore instituted scholarship programs to "help high achieving students pursue a post-secondary education," id., and "provide financial assistance and support services to students from educationally and economically disadvantaged backgrounds," https://www.nj.gov/highereducation/EOF/EOF_ Eligibility.shtml.

188.    In New Mexico, there are twenty-six public higher education institutions, of which 10 are branch community colleges, funded by the state. The amount of money appropriated to publicly funded colleges and universities in recent years has been between $20 million and $22 million annually.

189.    New York State also funds a public university and community college system with the stated mission of "providing the people of New York with educational services of the highest quality, with the broadest possible access, fully representative of all segments of the population in a complete range of academic, professional and vocational postsecondary programs." New York Education Law § 351.

190.    Article IX, Section 9 of the North Carolina Constitution requires the state to ensure "the benefits of The University of North Carolina and other public institutions of higher education, as far as practicable, be extended to the people of the State free of expense." The General Assembly has said the purpose of the University of North Carolina is "to improve the quality of education, to extend its benefits and to encourage an economical use of the State's resources." N.C. Gen. Stat. § 116-1(a). Furthermore, North Carolina requires many non-public schools to meet licensure and educational quality standards. N.C. Gen. Stat. §§ 116-15; 115D-87, et seq.

191.    In Oregon, the legislature found that institutions of higher education are necessary to ensure the State's "survival and economic well-being." ORS 350.001. Oregon "needs able and imaginative" people "for the direction and operation of all its institutions," as well as an "informed citizenry" and "alert and informed consumers." Id. To achieve these ends, the legislature found that "Oregonians need access to educational opportunities beyond high school and throughout life." ORS 350.005. Between 2017 and 2019, Oregon spent over $2 billion on

43

higher education, including $736.9 million on public universities and $570.3 million on community colleges. Funding for Oregon's 17 community colleges supports the institutions in meeting needs for state-level economic and workforce development.

192.    Pennsylvania's commitment to higher education is demonstrated through its funding of three separate systems of higher education. Specifically, Pennsylvania's State System of Higher Education ("PASSHE") institutions were created for the declared purpose of "provid[ing] high quality education at the lowest possible cost to [Pennsylvania] students," 24 P.S. § 20-2003-A. In the 2019-20 fiscal year alone, Pennsylvania appropriated $477.5 million to the aforementioned PASSHE institutions. Additionally, Pennsylvania funds state-related institutions comprised of the University of Pittsburgh, Temple University, Penn State University and Lincoln University, which have been described as an "integral part of a system of higher education in Pennsylvania" in "improving and strengthening higher education … [and] extend[ing] Commonwealth opportunities for higher education." *See, e.g.*, 24 P.S. § 2510-202(6) (regarding the University of Pittsburgh). In the 2019-20 fiscal year, Pennsylvania appropriated $597.1 million to state-related schools. Finally, Pennsylvania has recognized that the funding of community colleges "promotes the health, safety and welfare of our children." 2013 Pa. Legis. Serv. Act 2013-59 (H.B. 1141). In the 2019-20 fiscal year, Pennsylvania appropriated $243.9 million to community colleges. *See, e.g.*, Pennsylvania House Appropriations Committee, Higher Education: Primer at 8 (Sept. 18, 2019): https://www.houseappropriations.com/files/Documents/ HigherEd_BP_Final_091819%20--%202019-12-11_03-37-23.pdf (summarizing appropriations for all three systems of higher education).

193.    Likewise, Rhode Island has strong economic, sovereign, and quasi-sovereign interests in promoting opportunities for higher education through its public colleges and universities, which are "essential to the preservation of rights and liberties[.]" *See* R.I. Const. Art. XII sec. 1. In 1964, Rhode Island established the Community College of Rhode Island ("CCRI") to "offer all students the opportunity to acquire the knowledge and skills necessary for intellectual, professional and personal growth … while contributing to Rhode Island's economic development and the needs of the region's workforce." R.I. Gen. Laws § 16-33.1-2; *see also* R.I.

1    Gen. Laws § 16-107-2 ("Education is critical for the state's young people to achieve their dreams
2    and develop their talents … [t]he state's economic success depends on a highly educated and
3    skilled workforce"). In its continued commitment to higher education, Rhode Island enacted the
4    Promise Scholarship in 2017 to "increase the number of students enrolling in and completing
5    degrees on time from [CCRI]" and secure the State's "ability to make educational opportunities
6    beyond high school available for all students as part of a free public education[,]" by "providing
7    financial assistance to students who are restricted from participating in postsecondary education
8    because of insufficient financial resources." R.I. Gen. Laws §§ 16-56-1, 16-107-2(a)–(b).

9        194.    In Vermont, statutes acknowledge "[t]hat the right to education is fundamental for
10   the success …in a rapidly-changing society and global marketplaces as well as for the State's own
11   economic and social prosperity." 16 V.S.A. § 1. Vermont State Colleges' mission embodies this
12   directive by requiring that "Vermont Sate Colleges system provides affordable high quality,
13   student-centered and accessible education . . . ." vsc.edu/system-facts/mission-vision/.

14       195.    Virginia has also passed legislation committing to prepare its resident-students "by
15   establishing a long-term commitment, policy, and framework for sustained investment and
16   innovation that will (i) enable the Commonwealth to build upon the strengths of its excellent
17   higher education system and achieve national and international leadership in college degree
18   attainment and personal income and (ii) ensure that these educational and economic opportunities
19   are accessible and affordable for all capable and committed Virginia students." Va. Code § 23.1-
20   301(B). Virginia promotes access to quality higher education institutions through a program of
21   financial assistance that supports students attending non-profit institutions, *id.*, §§ 23.1-600 to
22   23.1-642, and by having established public institutions of higher education, including community
23   colleges, *id.* §§ 23.1-1300 to 23.1-2913.

24       196.    In Wisconsin, the legislature has stated that it is, "in the public interest to provide a
25   system of higher education which enables students of all ages, backgrounds and levels of income
26   to participate in the search for knowledge and individual development; which stresses
27   undergraduate teaching as its main priority; which offers selected professional graduate and
28   research programs with emphasis on state and national needs; which fosters diversity of

educational opportunity; which promotes service to the public; which makes effective and efficient use of human and physical resources; which functions cooperatively with other educational institutions and systems; and which promotes internal coordination and the wisest possible use of resources." Wis. Stat. § 36.01(1). As such, the University of Wisconsin System was created with a mission to "develop human resources, to discover and disseminate knowledge, to extend knowledge and its application beyond the boundaries of its campuses and to serve and stimulate society by developing in students heightened intellectual, cultural and humane sensitivities, scientific, professional and technological expertise and a sense of purpose. Inherent in this broad mission are methods of instruction, research, extended training and public service designed to educate people and improve the human condition. Basic to every purpose of the system is the search for truth." Wis. Stat. §§ 36.01(2), 36.03. The UW System has 13 universities across 26 campuses. The UW System is partially funded by state aid pursuant to statute. *See generally* Wis. Stat. § 20.285.

197.    Similarly, the Wisconsin legislature created a system of technical colleges to enable "eligible persons to acquire the occupational skills training necessary for full participation in the work force; which stresses job training and retraining; which recognizes the rapidly changing educational needs of residents to keep current with the demands of the work place and through its course offerings and programs facilitates educational options for residents; which fosters economic development; which provides education through associate degree programs and other programs below the baccalaureate level; which functions cooperatively with other educational institutions and other governmental bodies; and which provides services to all members of the public." Wis. Stat. § 38.001.

198.    Additional purposes of Wisconsin's technical colleges are to "contract with secondary schools, including tribal schools, to provide educational opportunities for high school age students in order to enhance their potential for benefiting from postsecondary education and for obtaining employment; coordinate and cooperate with secondary schools, including tribal schools, to facilitate the transition of secondary school students into postsecondary technical college education through curriculum articulation and collaboration; provide a collegiate transfer

program; provide community services and avocational or self-enrichment activities; provide education in basic skills to enable students to effectively function at a literate level in society; and provide education and services which address barriers created by stereotyping and discriminating and assist individuals with disabilities, minorities, women, and the disadvantaged to participate in the work force and the full range of technical college programs and activities." Wis. Stat. § 38.001(3). Wisconsin has 16 technical colleges across 51 campuses. The WTCS is partially funded by state aid pursuant to statute. *See generally* Wis. Stat. 20.292.

199.    For-profit schools often advertise to vulnerable students with modest financial resources. Many of these students are the first in their families to seek higher education. Many for-profit schools have deliberately targeted low-income and minority residents with deceptive information about their programs and enrolled them in programs that were unlikely to lead to employment that would allow graduates to repay the high costs of tuition. As a result, low-income and minority residents, who would be good candidates to benefit from the programs offered at the States' community colleges, are often the primary victims of institutional misconduct by for-profit schools.

200.    Federal law prohibits students from securing additional federal financial aid when they have either defaulted on their federal student loans or reached the maximum aggregate federal-loan limit. 20 U.S.C. § 1091(a)(3); 34 C.F.R. § 668.32(g). ED's rescission of the 2016 Rule and replacement with the 2019 Rule, which provides no meaningful process for defrauded borrowers to discharge their federal student loans, thus delays, limits, or blocks current and prospective students from continuing their educations at the States' public colleges and universities, unless the students can afford tuition and other education-related expenses without financial aid. Few, if any, can.

201.    As a result, the States' public colleges and universities cannot enroll these diverse, underrepresented students. Nor will they be able to enroll future students who will attend programs at predatory institutions that remain in operation merely because the 2019 Rule fails to hold them accountable for their misconduct. The inability to enroll these students harms the educational mission of the States' public colleges and universities, and causes financial loss to the

47

States from the lost enrollment of these students.

202.    Moreover, decreased enrollment in publicly funded schools harms States because those schools receive more federal funding commensurate with enrollment. For example, in the 2018-2019 academic year, Colorado community college students received over $88 million dollars in federal Pell grants. This is 33% of the financial aid that Colorado's community college students received during the 2018-2019 academic year. *See* Colo. Cmty. Coll. Sys., *Fact Book, Academic Year 2018-2019* at 72 (Oct. 2019), https://www.cccs.edu/wp-content/uploads/ documents/AY-2018-2019-Fact-Book-Master-Copy-Revised-10.17.2019-final.pdf.

203.    In California, loss in enrollment has a negative ripple effect on California community colleges because 70% to 90% of most colleges' funding is based on factors related to enrollment. Further, declines in enrollment reduce base and supplement grants for colleges. As a result, colleges will be forced to scale back their offerings, causing a shortage of available course selections for students, staffing, and support services. Ultimately, reduced enrollment will result in a loss of college graduates at a time when California needs to be developing a more highly skilled workforce to support its economic recovery.

204.    Additionally, the loss of these students also harms the States by depriving the States of the opportunity to hire these students through the Federal Work-Study Program. 20 U.S.C. § 1087-51–1087-58. Employers eligible under the Federal Work-Study Program include, among others, the States' public colleges and universities, as well as state agencies. 20 U.S.C. § 1087-51(c). The program encourages students to participate in community-service activities and engenders in students a sense of social responsibility and commitment to the community. 20 U.S.C. § 1087-51(a).

205.    Financial aid through the Federal Work-Study Program mutually benefits both eligible students and eligible employers. Students benefit by earning money to help with their educational expenses. Employers benefit by receiving a subsidy from the federal government that, in most cases, covers more than 50% of the student's wages. In some cases, such as for reading or mathematics tutors, the federal share of the wages can be as high as 100%. Because of ED's rescission of the 2016 Rule and replacement with the 2019 Rule, students will enroll in programs

1   at for-profit schools that would otherwise be inaccessible, and States' public colleges and

2   universities, as well as state agencies, will be unable to hire these students.

3       **B.      Harms to the States' Fiscs**

4       206.    ED's rescission of the 2016 Rule and replacement with the 2019 Rule causes

5   concrete and particularized injury to the States by directly and indirectly harming their state fiscs.

6       207.    For example, the California Student Aid Commission ("CSAC") administers state

7   financial-aid programs for students attending public and private universities, colleges, and

8   vocational schools in California. CSAC's central mission is to make education beyond high

9   school financially accessible to all Californians. Among other things, CSAC administers the Cal

10  Grant program, a state-funded program that provides need-based grants to California students.

11  Cal Grants are the largest source of California-funded student financial aid. Cal Grant spending

12  has more than doubled over the past decade. Cal Grant spending increased from $1 billion in

13  2009-10 to $2.6 billion in 2019-20.

14      208.    For a school to qualify to receive Cal Grants, that school must, among other things,

15  be a "qualified institution" under federal law, 34 C.F.R. § 600, *et. seq.*, meaning that it is

16  institutionally eligible to participate in Title IV. *See* Cal. Code Regs. tit. 5, § 30009. Accordingly,

17  California state law incorporates federal law to determine which schools qualify to receive Cal

18  Grants. Each year, California expends substantial funds in the form of Cal Grants to support

19  students that attend programs at for-profit schools.

20      209.    Similarly, the Illinois Student Assistance Commission ("ISAC") administers the

21  Monetary Award Program ("MAP"), a state-funded grant program that provides need-based

22  grants to Illinois students. Illinois law also incorporates federal law to determine which schools

23  qualify to receive MAP grants. Schools that receive MAP grants are required to have a valid

24  program participation agreement with ED. 23 Ill. Admin. Code § 2700.30 (l) *citing* 20 U.S.C.

25  § 1094. In 2018, $4,080,002 in Illinois need-based grants went to for-profit schools. *See* Annual

26  Survey of the National Association of State Student Grant & Aid Programs, Table 9 History:

27  2004-2018, https://www.nassgapsurvey.com/.

28      210.    Overall, in 2018 alone, more than $100 million was spent by the States on need-

based grants that went to for-profit schools. *Id.* Additionally, in 2017, at least one for-profit school in every State and the District of Columbia reported to the National Center for Education Statistics having received state grant money. *See* Nat'l Center for Education Statistics, *Integrated Postsecondary Education Data System*, (search conducted June 12, 2020).

211.    When a State pays some or all of a student's costs to attend a predatory institution that offers substandard programs with poor outcomes, the State is harmed. The States have an interest in investing in beneficial higher education programs, not programs that leave students with poor job prospects, worthless degrees, and unrepayable debt.

212.    ED's rescission of the 2016 Rule and replacement with the 2019 Rule means that the States will expend substantial funds in student aid, like California's Cal Grant program, to support students who will attend substandard programs at predatory schools, which would otherwise be inaccessible to students. Considerable state funds will thus be spent on education that offers no return on the States' investment and fails to meet the objectives of the States' aid programs.

213.    ED's rescission of the 2016 Rule and replacement with the 2019 Rule will also require States to expend funds to support students who attended substandard programs at predatory schools that do not prepare them for the workforce and who will then need to seek additional job training or education.

214.    Furthermore, by eliminating disincentives to institutional misconduct, the 2019 Rule will require States to expend considerable resources investigating and taking action to address institutional misconduct. For an institution to be eligible for the HEA's grant programs, it must be "legally authorized to provide an educational program beyond secondary education in the State in which the institution is physically located." 34 C.F.R. § 600.4(a)(3); *accord id.* § 600.5(a)(4); *id*. 600.6(a)(3). An institution "is legally authorized by a State if the State has a process to review and appropriately act on complaints concerning the institution including enforcing applicable State laws." *Id*. § 600.9(a)(1). In a recent rulemaking, ED cited this provision as providing students with important consumer protection. 84 Fed. Reg. 58,843 (Nov. 1, 2019). Additionally, State Attorneys General enforce consumer protection statutes that prohibit

1  unfair and deceptive acts or practices that harm consumers, including the unfair or deceptive

2  conduct of for-profit schools.[10] As a result of ED's repeal of the 2016 Rule and replacement with

3  the 2019 Rule, more students will lodge complaints with Plaintiff States about institutional

4  misconduct. Under 34 C.F.R. 600.9(a)(1), the Plaintiff States must expend resources to accept and

5  "appropriately act" on those complaints. Additionally, to protect students from being defrauded

6  by predatory schools that work to enroll students in worthless programs, Attorneys General for

7  the States will need to undertake costly investigations and incur significant enforcement expenses.

8      **C.    Harms to the States' Residents**

9      215.    ED's rescission of the 2016 Rule and replacement with the 2019 Rule causes

10  concrete and particularized injury to the States by directly and indirectly harming their residents.

11      216.    The 2016 Rule was one of the key protections afforded to prospective and enrolled

12  students against predatory schools. Because of ED's rescission of the 2016 Rule and replacement

13  with the 2019 Rule, predatory institutions will face fewer deterrents to engaging in misconduct.

14  As a result, more predatory institutions will continue to operate or remain eligible to participate in

15  Title IV aid than would have if the 2016 Rule had remained in effect. These institutions will

16  continue to defraud the States' residents, substantially affecting the economic health and well-

17  being of these students and their families, their financial and educational opportunities, their

18  ability to obtain higher-paying jobs to support themselves and their families, and their ability to

19  improve their lives after having fallen victim to a predatory school.

20      217.    There are also significant indirect effects of ED's actions that extend beyond

21  economic injury. Student loans, especially those taken out to attend a program offered by a

22  predatory institution, are a source of stress and anxiety for borrowers and their families. Financial

23  strain and consumer debt have been associated with depression and poor psychological

24  functioning. Borrowers with higher student debt are more likely to forego home ownership, delay

---

25            [10] *See, e.g.*, Cal. Bus. & Prof. Code § 17200, *et seq.*; Colo. Rev. Stat. § 6-1-101, *et seq.*; Conn.
26  Gen. Stat. Sec. 42-110b; Del. Code Ann. tit. 6, §§ 2511–2527, 2531–2536; D.C. Code § 28-3901, *et seq.*; Haw. Rev. Stat. § 480-2; 815 ILCS 505/2; Md. Code Ann., Com. Law § 13-101, *et seq.*; Mass.
Gen. Law ch.93A, § 1, *et seq.*; Minn. Stat. §§ 325D.44, 325F.69; N.J. Stat. Ann. § 56:8-2; New York
27  General Business Law §§ 349–350; New York Executive Law § 63(12); N.C. Gen. Stat. § 75-1, *et seq.*; ORS 646.605, *et seq.*; 73 Pa. Stat. § 201-1, *et seq.*; R.I. Gen. Laws § 6-13.1-1, *et seq.*; 9 V.S.A.
28  § 2451, *et seq.*; Va. Code § 59.1-196, *et seq.*; Wis. Stat. § 100.18.

marriage and parenthood, and suffer long-term lost wealth.

218.    Many borrowers victimized by predatory schools are already in dire financial circumstances. Being forced to repay even a portion of loans taken out to attend a predatory institution threatens borrowers' ability to pay for basic expenses like food and rent, and economic deprivation can wreak havoc on families.

219.    The 2019 Rule effectively prevents borrowers from obtaining relief from their federal student loans when they have been defrauded by a predatory institution. This creates substantial disruption in the lives of students. For example, defrauded students will lose the opportunity to continue their educations because the federal borrower defense process is the only process by which borrowers can seek to have their federal student-loans discharged.

220.    Federal law prohibits students with defaulted federal loans from obtaining grants, loans, or work assistance under Title IV. 20 U.S.C. § 1091(a)(3); 34 C.F.R. § 668.32(g)(1). Thus, borrowers who defaulted on their federal student loans are ineligible for additional financial aid, including additional federal loans and participation in the Federal Work-Study Program. *Id*. The dire financial circumstances of many students defrauded by predatory institutions means that they cannot pay back even a fraction of the invalid loans taken out to attend such institutions. A meaningful borrower-defense process is the only way for these borrowers to discharge their loans, thereby resolving the defaulted status of their loans, making them eligible for additional financial aid, and allowing them to continue their educations.

221.    Even defrauded borrowers who are not in default and who may be able to pay back their federal student loans taken out to attend a predatory institution could lose the opportunity to continue their educations. Federal law limits the total aggregate amount of federal loans that a borrower can have outstanding at any given moment. The current, maximum aggregate loan limit for a dependent undergraduate student is $23,000 for subsidized loans, and $31,000 for unsubsidized loans. 34 C.F.R. §§ 685.203(d)(1), (e)(1). For independent undergraduate students, the maximum is $57,500 for unsubsidized loans, less any subsidized loan funds the student has already received. *Id*. § 685.203(e)(2). Thus, defrauded borrowers that have maxed out their federal loan eligibility to attend a predatory institution will be effectively blocked from obtaining

52

meaningful additional federal student loans until the prior loans are substantially paid off or discharged. 34 C.F.R. § 668.32(g)(1). A meaningful borrower-defense process would allow defrauded borrowers to discharge their prior loans, thereby making them eligible for additional financial aid, and allowing them to continue their educations. ED acknowledges this. *See, e.g.*, 84 Fed. Red. 49,888 (noting a successful borrower defense claim could make students "eligible for additional subsidized loans"), 49,899 ("Some borrowers may be eligible for additional subsidized loans" as a result of a successful "defense to repayment discharge").

222.    Accordingly, ED's rescission of the 2016 Rule and replacement with the 2019 Rule—which fails to provide a meaningful borrower defense process—will cut off availability of further federal aid (including loans and work assistance) that would have been available to these students under the 2016 Rule, allowing them to further their educations.

### D.    Harms to the States' Quasi-Sovereign Interests

223.    ED's rescission of the 2016 Rule and replacement with the 2019 Rule causes concrete and particularized injury to the States by directly and indirectly harming their "quasi-sovereign" interests in the health and well-being—both physical and economic—of their residents.

224.    In particular, the States' interests include avoiding economic harm to their student-borrowers; ensuring the well-being of their citizens, including through the promotion of their education; protecting consumers; and regulating education at all levels within the state.

225.    Efforts by for-profit schools to take advantage of and defraud low-income, vulnerable students seeking to better themselves through education impacts a substantial portion of the States' populations. Individual students have suffered, and will continue to suffer, concrete harm as a result of ED's rescission of the 2016 Rule and replacement with the 2019 Rule.

226.    Education is critical to the future of the States. Postsecondary education is an integral aspect of living and working in each of the States.

227.    As such, funding education is one of the most important functions performed by each of the States. For example, in 2016-17, higher education was the third largest General Fund expenditure in California, receiving $14.6 billion in resources, which accounted for 11.9% of

General Fund resources. The majority of California's higher-education funding was divided among California's three postsecondary education systems: University of California; California State University; and California Community Colleges.

228.   The States have a strong interest in the regulation of postsecondary schools within their borders. Federal law, including the 2016 Rule, has a significant impact on the regulation of these schools because of student reliance on federal financial aid.

229.   States have historically been the primary regulators of higher education. Over time, the federal government's role in the regulation of higher education has increased. In particular, the HEA increased the role of the federal government in postsecondary education, primarily by creating the system of loans, subsidies, and grants that fund higher education to this day.

230.   The States are part of the "triad" of actors—the federal government, state governments, and accreditors—that currently regulate postsecondary education. One of the State's primary roles in the triad is consumer protection.

231.   Each State's consumer-protection laws regulate commerce within the State's borders and apply to for-profit schools. Each State is charged with enforcing its consumer-protection laws and ensuring that these laws are uniformly and adequately enforced. Each State has a sovereign and quasi-sovereign interest in ensuring consumer protection within its borders. The States also have a quasi-sovereign and parens patriae interest in protecting the health, safety, and welfare of their residents.

232.   To this end, the States have initiated numerous costly and time-intensive investigations and enforcement actions against proprietary and for-profit schools for violations of the States' consumer protection statutes. *See* Appendix A.

233.   State investigations and enforcement actions are afforded a legally significant status under the 2016 Rule, which ED rescinded with the 2019 Rule. *See* 81 Fed. Reg. 76,083 (34 C.F.R § 685.222(b) (2016 Rule provision that a judgment obtained by a governmental agency against a postsecondary institution based on state law will give rise to a borrower defense to loan repayment)); *id.* at 76,080-01, 084-85 (34 C.F.R §§ 685.222(e)(7)(iii)(C), 685.222(h)(5)(iii)(C),

1   and 685.206(c)(4)(iii) (2016 Rule provisions that a state agency's issuance of a civil investigative

2   demand against a school whose conduct resulted in a borrower defense will qualify as notice

3   permitting the Secretary to commence a collection action against the school)).

4          234.    The 2016 Rule enhanced the effectiveness of state enforcement efforts, improved

5   the remedies available for violations of state law, deterred misconduct by educational institutions,

6   and protected the wellbeing of the States' respective residents. The 2016 Rule provided a joint

7   federal and state process for protecting students and providing relief to injured students. ED's

8   rescission and replacement of the 2016 Rule with the 2019 Rule deprives the States of benefits to

9   their enforcement systems and injures the States' residents by removing the rights and protections

10  provided by the 2016 Rule.

11

12

13                                **CAUSES OF ACTION**

                                      **COUNT 1**

14

15  **Agency Action that Was Arbitrary, Capricious, and Abuse of Discretion, or Otherwise Not
           in Accordance with Law**

16                      **Violation of APA § 706(2)(A)**

17         235.    The States incorporate by reference the foregoing paragraphs.

18         236.    ED's rescission of the 2016 Rule and promulgation of the 2019 Rule were

19  premised on unacknowledged and unreasoned changes of position, were contrary to considerable

20  evidence in the record before ED, and failed to address critical aspects of the problem to which

21  ED was purportedly responding.

22         237.    ED's adoption of the 2019 Rule imposes unreasonable burdens on borrowers who

23  have been harmed by abusive schools and eliminates critical measures designed to deter future

24  institutional misconduct.

25         238.    In particular, ED's narrowing of the permissible bases for borrower defense claims

26  and creation of unachievable evidentiary standards pose insurmountable barriers to borrowers

27  seeking to establish borrower defense claims. The new standard promulgated in the 2019 Rule is

28  arbitrary and capricious because it is inconsistent with the evidence before ED, is based on

                                          55

unexplained deviations from ED's prior positions, and ignores critical resource imbalances between students and predatory institutions.

239.    ED's elimination of the group discharge process for borrower defense claims is arbitrary and capricious because it is inconsistent with evidence before ED, is based on an unexplained reversal of position, and relies on inconsistent reasoning.

240.    ED's elimination of the automatic closed school discharge process is arbitrary and capricious because it is based on inconsistent reasoning and an unexplained change of position, and ignores the harm caused to borrowers by ED's policy change.

241.    ED's elimination of the 2016 Rule's limitations on institutions' use of class action waivers and mandatory pre-dispute arbitration agreements is arbitrary and capricious because it is based on flawed reasoning and unsupported conclusions, ignores evidence on the record, and fails to appropriately consider the harms that ED's change of policy will cause to borrowers.

242.    ED's elimination of repayment rate and financial protection disclosure requirements is arbitrary and capricious because it is based on an unacknowledged deviation from ED's prior policy position, is internally inconsistent, and ignores the consequences for borrowers of depriving them of essential information.

243.    ED's failure to engage in reasoned decisionmaking renders the 2019 Rule arbitrary, capricious, and contrary to law in violation of the APA, 5 U.S.C. § 706(2)(A).

## **COUNT 2**

**Agency Action Not in Accordance with Law and in Excess of Statutory Jurisdiction, Authority, or Limitations, or Short of Statutory Right**
**Violation of APA §§ 706(2)(A), (C)**

244.    The States incorporate by reference the foregoing paragraphs.

245.    In creating a wholly insurmountable borrower defense standard and claims process, ED has failed to give effect to the congressional directive in the HEA, 20 U.S.C. § 1087e(h), which requires ED to "specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a loan made under [the Direct Loan Program.]" This directive mandates the creation of a process by which borrowers can

56

1   actually obtain relief.

2       246.   The standards and claims process established in the 2019 Rule are illusory and fail

3   to achieve the congressional mandate set forth in 20 U.S.C. § 1087e(h).

4       247.   The 2019 Rule is thus not in accordance with law and in excess of statutory

5   jurisdiction, authority, or limitations, or short of statutory right, in violation of 5 U.S.C.

6   §§ 706(2)(A), (C).

7       248.   Accordingly, ED's 2019 Rule is contrary to law in violation of the APA and must

8   be set aside. 5 U.S.C. § 706(2).

9

10                              **PRAYER FOR RELIEF**

11       WHEREFORE, the States request that this Court grant the following relief:

12           A.   Declare the 2019 Rule unlawful;

13           B.   Vacate the 2019 Rule in its entirety; and

14           C.   Grant such additional relief as the Court deems appropriate and just.

15

16   Dated: July 15, 2020                 Respectfully submitted,

17

18                                        */s/ Yael Shavit*
                                          YAEL SHAVIT
19                                        MIRANDA COVER
                                          Assistant Attorneys General
20
                                          *Attorneys for Plaintiff the Commonwealth of*
21                                        *Massachusetts*

22

23                                        */s/ Bernard A. Eskandari*
                                          BERNARD A. ESKANDARI
24                                        Supervising Deputy Attorney General

25                                        *Attorney for Plaintiff the People of the State*
                                          *of California*
26

27

28

**PHILIP J. WEISER**
Attorney General
State of Colorado

*/s/ Olivia D. Webster*
Olivia D. Webster* (Pro Hac Forthcoming)
Senior Assistant Attorney
Kevin. J. Burns* (Pro Hac Forthcoming)
Assistant Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6000
Libby.Webster@coag.gov
Kevin.Burns@coag.gov
*Counsel of Record
*Attorneys for Plaintiff State of Colorado*


**WILLIAM TONG**
Attorney General
State of Connecticut

*/s/ Joseph J. Chambers*
Joseph J. Chambers (Pro Hac Forthcoming)
Assistant Attorney General
Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
Tel: (860) 808-5270
Fax: (860) 772-1709
Email: joseph.chambers@ct.gov
*Attorney for Plaintiff State of Connecticut*


**KATHLEEN JENNINGS**
Attorney General
State of Delaware

*/s/ Vanessa L. Kassab*
Christian Douglas Wright
Director of Impact Litigation
Vanessa L. Kassab (Pro Hac Forthcoming)
Deputy Attorney General
Delaware Department of Justice
820 North French Street, 5th Floor
Wilmington, DE 19801
(302) 577-8600
vanessa.kassab@delaware.gov
*Attorneys for Plaintiff State of Delaware*

58

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**KARL A. RACINE**
Attorney General
District of Columbia

*/s/ Benjamin M. Wiseman*
Benjamin M. Wiseman (Pro Hoc
Forthcoming)
Director, Office of Consumer Protection
Attorney General for the District of
Columbia
441 4th Street, N.W., 6th Floor
Washington, DC 20001
202-741-5226
Benjamin.wiseman@dc.gov
*Attorney for the District of Columbia*

**CLARE E. CONNORS**
Attorney General
State of Hawai'i

*/s/ Thomas Francis Mana Moriarty*
Bryan C. Yee
Thomas Francis Mana Moriarty (Pro Hac
Forthcoming)
Deputy Attorneys General
425 Queen Street
Honolulu, HI 96813
Tel: (808) 586-1180
Fax: (808) 586-1205
Email: mana.moriarty@hawaii.gov
*Attorneys for Plaintiff the State of Hawai'i*

1
2

**KWAME RAOUL**
Attorney General
State of Illinois

3
4

*/s/ Caleb Rush*
Caleb Rush (SBN 189955)
Assistant Attorney General
Greg Grzeskiewicz

5

Bureau Chief, Consumer Fraud Bureau
Joseph Sanders

6

Gregory W. Jones
Assistant Attorneys General, Consumer

7

Fraud Bureau
Office of the Illinois Attorney General

8

100 W. Randolph St., 12th Fl.
Chicago, IL 60601

9

312-814-6796 (Sanders)
312-814-4987 (Jones)

10

312-793-0793 (Rush)
Fax: 312-814-2593

11

jsanders@atg.state.il.us
gjones@atg.state.il.us

12

crush@atg.state.il.us
*Attorneys for Plaintiff State of Illinois*

13

14

**AARON M. FREY**
Attorney General

15

State of Maine

16

*/s/ Jillian R. O'Brien*

17

Jillian R. O'Brien, Cal. SBN 251311

18

Assistant Attorney General
Office of the Attorney General

19

6 State House Station
Augusta, ME 04333-0006

20

jill.obrien@maine.gov
207-626-8582

21

*Attorneys for Plaintiff the State of Maine*

22

23

24

25

26

27

28

Complaint for Declaratory and Injunctive Relief
Case No. 20-cv-04717

1

2

**BRIAN E. FROSH**
Attorney General
State of Maryland

3

4

*/s/ Christopher J. Madaio*
Christopher J. Madaio (Pro Hac
Forthcoming)

5

6

Assistant Attorney General
Office of the Attorney General
Consumer Protection Division

7

200 St. Paul Place, 16th Floor
Baltimore, MD 21202

8

(410) 576-6585
cmadaio@oag.state.md.us

9

*Attorney for Plaintiff State of Maryland*

10

11

**DANA NESSEL**
Attorney General

12

State of Michigan

13

*/s/ Brian G. Green*
Brian G. Green (Pro Hac Forthcoming)

14

Assistant Attorney General

15

Michigan Department of Attorney General
525 West Ottawa Street, 5th Floor

16

P.O. Box 30736
Lansing, MI 48933

17

(517) 335-7632
GreenB@michigan.gov

18

*Attorney for Plaintiff State of Michigan*

19

20

**KEITH ELLISON**
Attorney General

21

State of Minnesota

22

*/s/ Adam Welle*

23

Adam Welle (Pro Hac Forthcoming)
Assistant Attorney General

24

Bremer Tower, Suite 1200
445 Minnesota Street

25

St. Paul, MN 55101
(651) 757-1425 (Voice)

26

(651) 282-5832 (Fax)

27

adam.welle@ag.state.mn.us
*Attorney for Plaintiff the State of Minnesota*

28

61

1
2

**AARON D. FORD**
Attorney General
State of Nevada

3
4

ERNEST D. FIGUEROA
Consumer Advocate

5
6
7
8
9

*/s/ Laura M. Tucker*
Laura M. Tucker (Pro Hac Forthcoming)
Senior Deputy Attorney General
State of Nevada, Office of the Attorney
General
Bureau of Consumer Protection
8945 W. Russell Road, #204
Las Vegas, NV 89148
*Attorney for Plaintiff State of Nevada*

10
11
12

**GURBIR S. GREWAL**
Attorney General
State of New Jersey

13

Mayur P. Saxena
Assistant Attorney General

14
15
16
17
18
19

*/s/ Elspeth L. Faiman Hans*
Elspeth Faiman Hans (Pro Hac Forthcoming)
Melissa L. Medoway, Section Chief
Deputy Attorneys General
R.J. Hughes Justice Complex
25 Market Street, P.O. Box 112
Trenton NJ 08625
609-376-2752
elspeth.hans@law.njoag.gov
*Attorneys for Plaintiff State of New Jersey*

20
21

**HECTOR H. BALDERAS**
Attorney General
State of New Mexico

22
23
24
25
26

*/s/ Lisa Giandomenico*
Lisa Giandomenico (Pro Hac Forthcoming)
Assistant Attorney General
201 Third Street NW, Suite 300
Albuquerque, NM 87102
(505) 490-4846
lgiandomenico@nmag.gov
*Attorney for Plaintiff State of New Mexico*

27
28

Complaint for Declaratory and Injunctive Relief
Case No. 20-cv-04717

1                                            **LETITIA A. JAMES**

2                                            Attorney General
State of New York

3

                                            */s/ Carolyn M. Fast*

4                                            Carolyn M. Fast (Pro Hac Forthcoming)
Assistant Attorney General

5                                            Bureau of Consumer Frauds and Protection
28 Liberty Street

6                                            New York, NY 10005

7                                            (212) 416-6250
carolyn.fast@ag.ny.gov

8                                            *Attorney for Plaintiff State of New York*

9

10                                          **JOSHUA H. STEIN**

11                                          Attorney General
State of North Carolina

12                                          */s/ Matthew L Liles*

13                                          Matthew L. Liles (Pro Hac Forthcoming)
Assistant Attorney General

14                                          North Carolina Department of Justice
114 W. Edenton Street

15                                          Raleigh, NC 27603

16                                          (919) 716-0141
mliles@ncdoj.gov

17                                          *Attorney for Plaintiff State of North Carolina*

18

19                                          **ELLEN F. ROSENBLUM**

20                                          Attorney General
State of Oregon

21                                          */s/ Katherine A. Campbell*

22                                          Katherine A. Campbell (Pro Hac Forthcoming)
Assistant Attorney General

23                                          Oregon Department of Justice
100 SW Market Street

24                                          Portland, OR 97201

25                                          (971) 673-1880
katherine.campbell@doj.state.or.us

26                                          *Attorney for Plaintiff State of Oregon*

27

28

Complaint for Declaratory and Injunctive Relief
Case No. 20-cv-04717

1

2

**JOSH SHAPIRO**
Attorney General
Commonwealth of Pennsylvania

3

4

*/s/ Jacob B. Boyer*
Michael J. Fischer
Jesse F. Harvey
Chief Deputy Attorneys General
Jacob B. Boyer (Pro Hac Forthcoming)
Deputy Attorney General
Pennsylvania Office of Attorney General
1600 Arch St., Suite 300
Philadelphia, PA 19103
(267) 768-3968
jboyer@attorneygeneral.gov
*Attorneys for Plaintiff Commonwealth of Pennsylvania*

5

6

7

8

9

10

11

12

13

**PETER F. NERONHA**
Attorney General
State of Rhode Island

14

15

*/s/ Justin J. Sullivan*
Justin J. Sullivan (Pro Hac Forthcoming)
David Marzilli (Pro Hac Forthcoming)
Special Assistants Attorney General
Rhode Island Office of the Attorney General
150 S. Main St. Providence, RI 02903
Tel: (401) 274-4400 | Fax: (401) 222-2995
Ext. 2007 | jjsullivan@riag.ri.gov
Ext. 2030 | dmarzilli@riag.ri.gov

16

17

18

19

20

**THOMAS J. DONOVAN, JR.**
Attorney General
State of Vermont

21

22

*/s/ Merideth Chaudoir*
Merideth Chaudoir (Pro Hac Forthcoming)
Assistant Attorney General
Office of the Attorney General
109 State Street
Montpelier, VT 05609-1001
Merideth.Chaudoir@Vermont.gov
(802) 828-5507
*Attorney for Plaintiff State of Vermont*

23

24

25

26

27

28

64

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**MARK R. HERRING**
Attorney General
Commonwealth of Virginia

*/s/ Mark S. Kubiak*
Mark S. Kubiak (Pro Hac Forthcoming)
Assistant Attorney General, Consumer
Protection Section
Samuel T. Towell
Deputy Attorney General, Civil Litigation
Barbara Johns Building
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-7364
mkubiak@oag.state.va.us
*Attorneys for Plaintiff Commonwealth of
Virginia*


**JOSHUA L. KAUL**
Attorney General
State of Wisconsin
Wisconsin Department of Justice

*/s/ Shannon A. Conlin*
Shannon A. Conlin (Pro Hac Forthcoming)
Assistant Attorney General
Post Office Box 7857
Madison, WI 53707-7857
(608) 266-1677
Conlinsa@doj.state.wi.us
*Attorney for Plaintiff State of Wisconsin*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**APPENDIX A**

66

1    The following are examples of enforcement actions brought by the States against for-

2    profit schools since 2012:

3    • **Ashford University, LLC/Zovio (formerly Bridgepoint Education, Inc.)**

4      o  Complaint, *California v. Ashford University, LLC, et al*. No.
         RG17883963 (Cal. Super. Ct. Nov. 29, 2017) *available at*

5         https://oag.ca.gov/system/files/attachments/press_releases/Complaint_8
          .pdf.

6

7    • **Brensten Education, Inc.**

      o  Complaint, *State of Wisconsin v. Brensten Education, Inc., et al*.,
8         Milwaukee County Case Number 2018CX2, case consolidated into
          Case Number 2017CV013737.

9

10   • **Career Education Corporation (including the Sanford Brown schools)**

      o  Assurance of Discontinuance obtained by New York on August 19,
11        2013. *See* Press Release, A.G. Schneiderman Announces
          Groundbreaking $10.25 Million Dollar Settlement With For-Profit

12        Education Company That Inflated Job Placement Rates To Attract
          Students (Aug. 19, 2013) *available at* https://ag.ny.gov/press-

13        release/ag-schneiderman-announces-groundbreaking-1025-million-
          dollar-settlement-profit.

14

15   • **The Career Institute, LLC.**

      o  Complaint, *Massachusetts v. The Career Institute, LLC., et al*., No. 13-
16        4128H (Mass. Super. Ct. Sept. 17, 2015) *available at*
          http://www.mass.gov/ago/docs/consumer/aci-amended-complaint.pdf;

17        Final Judgment by Consent, Massachusetts v. The Career Institute,
          LLC. *et al*., No. 13-4128H (Mass. Super. Ct. June 1, 2016) *available at*

18        http://www.mass.gov/ago/docs/consumer/aci-consent-judgment.pdf.

19

20   • **Corinthian Colleges, Inc. ("Corinthian")**

      o  Complaint, *Massachusetts v. Corinthian Colleges, Inc., et al.* No. 14-
21        1093 (Mass. Super. Ct. Apr. 3, 2014) *available at*
          http://www.mass.gov/ago/docs/press/2014/everest-complaint.pdf.

22    o  $1.1 billion judgment, *People of the State of California v. Corinthian
          Colleges, Inc., et al.*, No. CGC-13-534793 (Cal. Super. Ct, Mar. 23,

23        2016) *available at*
          https://oag.ca.gov/system/files/attachments/press_releases/Corinthian%

24        20Final%20Judgment_1.pdf.

      o  California's Objection to Bankruptcy Plan Confirmation, *In re
25        Corinthian Colleges, Inc., et al.*, No. 15-10952, Doc. No. 824 (Bankr.
          D. Del., Aug. 21, 2015).

26    o  Illinois investigation initiated on 12/14/2011; Opp. to Debtor's Obj.
          with findings, Doc. No. 1121, *In re Corinthian Colleges, Inc. et al.*, No.

27        15-10952 (Bankr. D. Del., Dec. 9, 2015).

28

- o Complaint, *State of Wisconsin v. Corinthian Colleges, Inc.*, Milwaukee County Case Number 2014CX0006.

- **DeVry University**
  - o Assurance of Discontinuance obtained by New York on January 27, 2017. *See* Press Release, A.G. Schneiderman Obtains Settlement with DeVry University Providing $2.25 Million in Restitution for New York Graduates Who Were Misled About Employment and Salary Prospects After Graduation (January 31, 2017), *available at* https://ag.ny.gov/press-release/ag-schneiderman-obtains-settlement-devry-university-providing-225-million-restitution.
  - o Assurance of Discontinuance obtained by Massachusetts on June 30, 2017. *See* Press Release, AG Healey Secures $455,000 in Refunds for Students Deceived by Online For-profit School (July 5, 2017), *available at* http://www.mass.gov/ago/news-and-updates/press-releases/2017/2017-07-05-refunds-for-students-deceived-by-online-for-profit-school.html.

- **Education Management Corporation** (including The Art Institutes and Brown Mackie College)
  - o Complaint, *People of the State of Illinois v. Education Management Corporation*, *et al.*, No. 2015 CH 16728 (Cir. Ct. Cook County Nov. 16, 2015); Consent Judgment, *People of the State of Illinois v. Education Management Corporation, et al*., No. 2015 CH 16728 (Cir. Ct. Cook County Nov. 16, 2015).
  - o *Consumer Protection Division v. Education Management Corporation*, *et al.*, No. 24-C-15-005705 (Md. Cir. Ct. Nov. 16, 2015).
  - o Complaint, *State of New York v. Education Management Corp., et al.*, No. 453046/15 (N.Y. Sup. Ct. Nov. 16, 2015); Consent Order and Judgment (N.Y. Sup. Ct. Jan. 14, 2016).
  - o Complaint, *State of North Carolina v. Education Management Corporation, et al*, No. 15-CV-015426 (N.C. Sup. Ct. Wake County Nov. 16, 2015); Consent Judgment, *State of North Carolina v. Education Management Corporation, et al*, No. 15-CV-015426 (Sup. Ct. Wake County Nov. 16, 2015).
  - o Complaint, *State of Washington v. Education Management Corp., et al.*, No. 15-2-27623-9 SEA (King County Sup. Ct. Nov. 16, 2015); Consent Decree (King County Sup. Ct. Nov. 16, 2015).
  - o *District of Columbia v. Education Management Corporation, et al.* No. 2015 CA 8875 B (D.C. Sup. Ct.) (Consent Order entered on January 20, 2016).
  - o $95.5 million global settlement, intervention by States of California, Illinois, Minnesota, and others, *United States ex rel. Washington v. Education Management Corp., et al.*, No. 07-00461 (W.D. Pa., Nov. 13, 2015).

68

- **ITT Educational Services, Inc.**
  - o Complaint, *Massachusetts v. ITT Educ. Servs. Inc.*, No. 16-0411 (Mass. Super. Ct. Mar. 31, 2016).
  - o Complaint, *State of New Mexico v. ITT Educational Services, Inc. d/b/a/ ITT Technical Institute*, No. D-202-CV-2014-01604 (Second Judicial District Court Feb. 27, 2014).

- **Kaplan Higher Education, LLC**
  - o Assurance of Discontinuance, *In the Matter of Kaplan, Inc., Kaplan Higher Education, LLC*, No. 15-2218B (Mass. Super. Ct. July 23, 2015), *available at* http://www.mass.gov/ago/docs/press/2015/kaplan-settlement.pdf.

- **Lincoln Technical Institute, Inc.**
  - o Complaint, *Massachusetts v. Lincoln Tech. Inst.*, No. 15-2044C (Mass. Super. Ct. July 8, 2015); Consent Judgment, *Massachusetts v. Lincoln Tech. Inst.*, No. 15-2044C (Mass. Super. Ct. July 13, 2015), *available at* http://www.mass.gov/ago/docs/press/2015/lincoln-tech-settlement.pdf.

- **MalMilVentures, LLC, d/b/a Associated National Medical Academy**
  - o Statement of Charges, *Consumer Protection Division, Office of the Attorney General of Maryland v. MalMilVentures, LLC, d/b/a Associated National Medical Academy, et al.*, CPD No.: 10-009-182059 (In the Consumer Protection Division, Feb. 22, 2010); Final Order by Consent, *Consumer Protection Division, Office of the Attorney General of Maryland v. MalMilVentures, LLC, d/b/a Associated National Medical Academy, et al.*, OAG No.: 041006571 (In the Consumer Protection Division, June 7, 2010).

- **Minnesota School of Business, Inc. and Globe University, Inc.**
  - o Complaint, *Minnesota v. Minnesota School of Business, Inc., et al.*, No. 27-CV-14-12558 (Minn. Dist. Ct. July 22, 2014); Findings of Fact, Conclusions of Law and Order, *Minnesota v. Minnesota School of Business, et al.*, No. 27-CV-14-12558 (Minn. Dist. Ct. September 8, 2016).

- **Premier Education Group, L.P., d/b/a Harris School of Business**
  - o Cease and desist letter sent regarding misleading advertising. *See* Press Release, New Jersey Division of Consumer Affairs Issues Warning to Harris School of Business Related to Graduates' High Default Rates: High Default Rate Among Graduates Renders the For-Profit School Ineligible for NJCLASS Loans, Contrary to Misleading Information on Website, https://www.nj.gov/oag/newsreleases19/pr20190402b.html; Letter available at https://www.nj.gov/oag/newsreleases19/Harris-School-of-Business_Cease-and-Desist-Letter.pdf.

- **The Salter School**
  - o Complaint, *Massachusetts v. Premier Educ. Grp.*, No. 14-3854 (Mass. Super. Ct. Dec. 9, 2014), *available at* http://www.mass.gov/ago/docs/press/2014/salter-complaint.pdf; Final Judgment by Consent, *Massachusetts v. Premier Educ. Grp.*, No. 14-3854 (Mass. Super. Ct. Dec. 11, 2014), *available at* http://www.mass.gov/ago/docs/press/2014/salter-judgment-by-consent.pdf.

- **Sullivan & Cogliano Training Centers, Inc.**
  - o Complaint, *Massachusetts v. Sullivan & Cogliano Training Centers, Inc.*, No. 13-0357B (Mass. Super. Ct. Apr. 3. 2013), *available at* http://www.mass.gov/ago/audioandvideo/s-and-c-complaint.pdf; Consent Judgment, *Massachusetts v. Sullivan & Cogliano Training Centers, Inc.*, No. 13-0357B (Mass. Super. Ct. Oct. 28, 2013).

- **Westwood College, Inc.**
  - o Complaint, *People of the State of Illinois v. Westwood College, Inc., et al.*, No. 12 CH 01587 (Cir. Ct. Cook County Jan. 18, 2012); Second Amended Complaint, Doc. No. 57, No. 14-cv-03786 (N.D. Ill. Sept. 30, 2014); Settlement entered on October 9, 2015.

Complaint for Declaratory and Injunctive Relief
Case No. 20-cv-04717